JOHN F. MURTHA, ESQ.
**Nevada Bar No. 835**
WOODBURN AND WEDGE
Sierra Plaza
6100 Neil Road, Ste. 500
Post Office Box 2311
Reno, Nevada 89505
Telephone: 775-688-3000
Facsimile : 775-688-3088
jmurtha@woodburnandwedge.com

Attorneys for Trustee
William A. Leonard, Jr.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA
* * *

In re:

CONSOLIDATED NEVADA CORP.,

Debtor.

______________________________/

Case No. BK-13-51236-GWZ
Chapter 7

**TRUSTEE'S RESPONSE TO DEBTORS MOTION FOR AUTHORITY TO FILE AND PROSECUTE CLAIMS ON BEHALF OF BANKRUPTCY ESTATE OR, IN THE ALTERNATIVE, TO COMPEL ABANDONMENT OF CLAIMS (ECF 131)**[1]

Hearing Date: January 24, 2017
Hearing Time: 2:00 p.m.

Trustee William A. Leonard, Jr., by and through his counsel Woodburn and Wedge, hereby responds to the Debtor's and Paul Morabito's Motion for Authority to File and Prosecute Claims on Behalf of Bankruptcy Estate or, in the Alternative, to Compel Abandonment of Claims (ECF 131) ("Standing Motion") filed herein on December 27, 2016, as follows:

---

1 An identical motion was filed in Case No. 13-51237 and the Trustee filed a Response in that case. The substantive content of this Response is identical to the Response filed in Case No. 13-51237.

## 1. INTRODUCTION.

Paul Morabito ("Morabito") and Consolidated Nevada Corporation ("CNC") (collectively "Debtors") were engaged in significant pre-petition litigation against JH, Inc., Jerry Herbst and Berry-Hinckley Industries (collectively "Herbst Parties") in an action filed with the Second Judicial District Court of the State of Nevada ("State Court"). On October 12, 2010, the State Court entered Findings of Fact, Conclusions of Law, and Judgment against the Debtors and in favor of the Herbst Parties in which it entered judgment against the Debtors in the amount of $149,444,777.80 ("Judgment"). Eventually the Debtors and the Herbst Parties settled their rights and obligations under the Judgment and entered into a settlement agreement reducing the Debtors' obligations to the Herbst Parties to $85,000,000.

The Herbst Parties claimed the Debtors breached their obligations under the settlement agreement. On June 20, 2013, approximately 2 ½ years after the Judgment was entered, the Herbst Parties filed Involuntary Petitions against the Debtors (Case No. 13-51236 for CNC and Case No. 13-51237 for Morabito). Orders for Relief and Amended Orders for relief were entered on December 17 and 22, 2014, respectively.

At the Section 341 first meetings of creditors held on January 23, 2015, Mr. William A Leonard, Jr. ("Trustee") was elected and appointed as the trustee in this case. He has been serving as trustee of both Debtors' estates ever since.

On December 16, 2016, the Debtors filed an action against the Herbst Parties with the State Court claiming the Judgment had been obtained by fraud and seeking a variety of forms of relief (the "Declaratory Relief Action"). The Declaratory Relief Action is based

upon the argument Morabito only recently discovered evidence that the Judgment was obtained by fraud. The Declaratory Relief Action alleges claims for: (1) fraud upon the court; (2) NRCP 60(b) (3) fraud; (3) fraudulent inducement; and (4) fraudulent misrepresentation. It does not include any claims for avoidance of fraudulent transfers either under Nevada law or the Bankruptcy Code.

The Debtors did not, prior to filing the Declaratory Relief Action: (1) ask the Trustee to evaluate any purported claims against the Herbst Parties; (2) share the purported new evidence with the Trustee even though the Trustee asked Morabito about a potential claim objection against the Herbst Parties at his 341 meeting; nor (3) ever request that the Trustee bring any claims against the Herbst Parties.

By the Standing Motion the Debtors ask this Court to grant them:

> authority to file and prosecute the fraud claim [the Declaratory Relief Action] in State Court where the Herbsts committed the fraud, along with a fraudulent transfer claim to avoid the obligations incurred pursuant to the Settlement Agreement and recover the prepetition payments to the Herbtsts.
>
> *Standing Motion, p. 3, lns. 1-4.*

It is unclear whether the Debtors are asking for authority to prosecute only the Declaratory Relief Action or if they are also asking for authority to file another action to pursue fraudulent transfer claims as well. As noted above, the complaint in the Declaratory Relief Action does not include any fraudulent transfer claims.

Alternatively, the Debtors ask the Court to compel the Trustee to abandon the claims asserted in the Declaratory Relief Action (and perhaps any unasserted fraudulent transfer claims) to them.

///

The Standing Motion should be denied for two primary reasons. First, standing to assert claims similar to those asserted in the Declaratory Relief Action belongs to the Trustee and in this case the Debtors failed to advise the Trustee of the grounds supporting the Declaratory Relief Action even though Morabito was given the specific opportunity to do so after his discovery of the alleged new evidence. Second, even if Morabito's statements contained in his supporting Declarations are taken at face value, the Debtors have not established colorable claims against the Herbst Parties justifying the expense and delay in the administration of the Debtors' estates that would result from the prosecution of the claims.

In any event, if the Court determines the Debtors should be allowed to pursue the claims asserted in the Declaratory Relief Action, then, at most, they should be granted standing to pursue the claims, but the Trustee should not be compelled to abandon them to the Debtors. There are other creditors in this case beside the Herbst Parties and if there is any recovery from the Herbst Parties the recovery should be distributed to the Debtors' creditors before the Debtors receive any distributions on account of the claims.

## 2. GENERALLY, A TRUSTEE HAS THE EXCLUSIVE STANDING TO BRING CLAIMS ON BEHALF OF AN ESTATE.

The Bankruptcy Code does not permit derivative standing for creditors to file claims on behalf of a debtor or trustee. In those circuits allowing derivative standing, it is an implicit exception to the "general rule" whereby the Code assigns to the trustee or debtor "the privilege of prosecuting" various actions on behalf of the estate. *In re Baltimore Emergency Services II, Corp., 432 F. 3d 557, 560 (4th Cir. 2005), citing 7 Collier on Bankruptcy ¶ 1109.05[1].* The circuits that have permitted derivative standing have

done so in two limited circumstances – (i) when the trustee or debtor has unreasonably refused to bring the action such that the refusal is an abuse of discretion, and (ii) when the trustee or debtor consents. *Id. In re Applied Theory Corp., 493 F.3d 82, 85 (2nd Cir. 2007).* Those circuits that permit derivative standing do so under strict conditions and such standing is the exception, rather than the rule. *In re Baltimore, supra at 561, 562.* This is to "ensure that a would-be derivative suit would not simply advance the interests of a particular plaintiff at the expense of other parties to the bankruptcy proceeding." *Id.*

The Ninth Circuit has not recognized a general derivative right for a creditor to bring a claim absent the trustee's consent or Court approval. Compared to other circuits, the Ninth Circuit has been more restrained, broadly "hold[ing] that the bankruptcy code endows the bankruptcy trustee with the exclusive right to sue on behalf of the estate." *Estate of Spirtos v. One San Bernardino Cnty. Superior Court Case, 443 F.3d 1172, 1176 (9th Cir. 2006).* In a footnote, the *Spirtos* court recognized the only limited "exception" to this rule: where a trustee stipulated that a creditor could pursue a claim and that stipulation was filed and approved by the bankruptcy court. *Id. at n. 3 (citing In re Parametex, Inc., 199 F.3d 1029 (9th Cir. 1999)).*

The Ninth Circuit has expressed continuing approval of this broad rule as recently as May 2015. *See, In re Seymour, 601 Fed. Appx. 572 (9th Cir. 2015)* ("bankruptcy code endows the bankruptcy trustee with exclusive right to sue on behalf of the estate."); *Greenwood v. Onewest Bank, FSB, 593 Fed. Appx. 681 (9th Cir. 2015)* (affirming the District of Nevada's order dismissing appeal for lack of standing); *Voss v. Knotts, 570 Fed. Appx. 720 (9th Cir. 2014)* (only the trustee has standing); *Seneca v. First Franklin Financial Corp., 523 Fed. Appx. 655 (9th Cir. 2013)* (affirming dismissal for lack of

standing). "When the trustee does have standing to assert a debtor's claim, that standing is exclusive and divests all creditors of the power to bring the claim." *Ahcom, Ltd. v. Smeding, 623 F.3d 1248, 1250 (9th Cir. 2010)*. Because fraudulent transfer of assets out of the estate harms all estate creditors, and not just certain individuals, only the trustee has standing to bring claims based on the allegedly fraudulent transfer. *In re Adbox, Inc., 234 Fed. Appx. 420 (9th Cir. 2007); In re Mwangi, 473 B.R. 802 (D. Nev. 2012)* (denying appellants standing to pursue the trustee's turnover rights); *Bolick v. Pasionek, 2015 WL 1734936 (D. Nev. 2015)* (same).

The Debtors cite the case of *Eyak Native Village v. Exxon Corp., 25 F.3d 773 (9th Cir. 1994)* for the proposition they have standing to assert the claims in the Declaratory Relief Action because they are parties affected by Herbst Parties' fraud. *See, Standing Motion, p. 9, lns. 6-8.* The *Eyak* case is wholly inapposite to this case. It dealt with claims arising from the *Exxon Valdez* Alaska oil spill in 1989. The issue was whether individuals could assert certain environmental claims against Exxon, and others, after the Federal Government and the State of Alaska entered into a settlement agreement on the environmental claims. There is language in *Eyak* that supports the argument a non-party may seek relief from a judgment procured by fraud if the non-party's interests are directly affected. 25 F. 3d, 773, 777. This is a general statement of the law. The problem, however, is that the *Eyak* case DID NOT involve a bankruptcy proceeding. The rights the Debtors seek to enforce are property of the Debtors' estates subject to the Trustee's administration under the provisions of 11 USC §541.

In this case the Debtors never asked the Trustee to evaluate any purported claims against the Herbst Parties, nor did they make a demand on the Trustee to pursue the

claims at issue. More troubling, however, is the fact Morabito was questioned about any objections to the Herbsts' claims at the most recent session of his 341 First Meeting of Creditors held on December 5, 2016 (after he purportedly discovered the new evidence, but before the Declaratory Relief Action was filed) and he refused to provide any information even though he claimed valid grounds existed to object to the claims. Four days prior to the continued 341 meeting Morabito filed amended Statements of Assets and Liabilities (ECF 685). They indicated that part, but only part, of the Herbst Parties' claims were disputed. Regarding the Herbst Parties' claims the following exchange took place:

> **Q. [by Murtha] This - - The very first entry is for a claim by JH, Inc./Berry-Hinckley Industries.**
>
> **Do you see that, sir?**
>
> A. Yes.
>
> **Q. And towards the bottom that, there's a - - a statement describing the claim. Amount under confession of judgment is disputed, 85 million less 9 million in cash and time. [sic; should be "kind"]**
>
> A. Yes.
>
> **Q. 76 million is disputed. Amount under settlement agreement 21.5 million less 9 million in cash and kind. 12.5 million is not disputed.**
>
> **Do you see that, sir?**
>
> A. Correct.

**Q. Do you state today that you do not dispute $12.5 million of the Jerry Hinck --- JH, Inc. claim?**

A. I state that as of the date I signed this, I did not dispute that.

**Q. Okay, do you dispute it today?**

A. Potentially.

**Q. Pardon me?**

A. Potentially.

**Q. On what basis?**

A. On information that I'm hoping to ascertain the accuracy of.

**Q. Okay. The statements and schedules we're looking at right now were dated December 1st, 2016. Something –**

A. That's correct.

**Q. - - has changed?**

A. Yes.

**Q. What has changed?**

A. I had information made available to me that I'm trying to find out if it's actu - - - is accurate and true.

**Q. And what is that information? [QUES]**

A. I'm - -

MR. MONSOR: I object. This is Trey Monsour for Edward Bayuk. To the extent this involves attorney-client privileged information,

to the extent it overlaps with our joint defense agreement, I frankly urge your client no to - - to - - to violate that privilege.

MR. GILMORE: Okay. Let's do this. I'll instruct you not to answer anything which requests a conversation or information you had learned through the consultation of counsel - - either myself or counsel which is subject to the joint defense privilege.

THE WITNESS: Okay.

MR. GILMORE: So if - - if the answer to the question requires you to divulge that information, I'll instruct you not to answer.

THE WITNESS: I can't answer because of the attorney-client privilege.

A copy of the pages from Morabito's 341 exam containing the above exchange are attached hereto as Exhibit "1."

Interestingly, Morabito, at the advice of his counsel, did not answer the questions posed by the Trustee's counsel on the basis of privilege, but Morabito's Declaration in support of the Standing Motion references information obtained from a Mr. Walter Dwelle. Mr. Dwelle is identified in Morabito's Declaration as the CEO of Western Energetix, LLC and not as an attorney retained by the Debtor.

The Debtors cite several cases, including *In re Parmetex, Inc., 199 F. 3d 1029 (9th Cir. 1999),* for the proposition that a court may, for cause shown, authorize a third party to prosecute claims on behalf of an estate. In this case the Debtors did not make a demand upon the trustee to prosecute the claims alleged in the Declaratory Relief Action (or any other claims) prior to filing the Complaint or Standing Motion. When given the

opportunity to assist the Trustee to understand the Debtors' concerns about the Herbst Parties' claims at his 341 meeting, Morabito refused on the basis of attorney/client privilege even though the purported new evidence was not the result of attorney/client communications. The Debtors have simply not shown any good cause for this Court to Grant them standing to prosecute the Declaratory Relief Action.

**3. THE DEBTORS HAVE NOT ESTABLISHED THAT COLORABLE CLAIMS NECESSARILY EXIST AGAINST THE HERBST PARTIES.**

Those courts that have allowed someone other than a trustee to pursue a claim on behalf of an estate have required, among other things, the existence of a colorable claim. See, e.g. *In re The Gibson Group, Inc., 66 F.3d 1436, 1442 (6th Cir. 1995)*. Even if all of Morabito's statements in his supporting Declaration (ECF 738) are taken at face value to be true, the Debtors have failed to establish that the newly discovered evidence necessarily supports "colorable claims" against the Herbst Parties.

Because the Debtors failed to invite the Trustee to investigate the alleged fraud claims and to provide him with any information about them, the Trustee's analysis is limited to the information contained in the Declaratory Relief Action, the Standing Motion and the Morabito Declaration. It is expected the Herbst Parties will have much more information about the "working capital" issue and whether the evidence contained in Morabito's Declaration is truly new. Based upon the information that is contained in the record, however, the Trustee does not believe colorable claims exist against the Herbst Parties.

First, the record does not explain why the purported newly discovered evidence wasn't previously available to the Debtors or their professionals during the original trial, or

in the 6 years since. It is clear Berry-Hinckley Industries' books and records played a key role in relation to the working capital issue. Morabito does not explain why neither he, his counsel nor his accounting experts did not discover the information regarding the Western Energetix account during discovery in the state court action or during the examination by the independent expert even though they knew the Western Energetix account was an important component of Berry Hinckley Industries' business. Morabito says "the [Western Energetix] reimbursement obligation averaged between $1 million and $1.5 million **per month** depending on the season" and that "Western Energetix was Berry Hinckley Industries' primary supplier of fuel and the largest component of the accounts payable analysis at trial." *Morabito Declaration, p. 4, lns. 10-11 and p. 5, lns. 6-7 (emphasis added)*. Given the magnitude of the transactions between Western Energetix and Berry Hinckley Industries one would think Western Energetix would have been questioned about its dealings with Berry Hinckley Industries in the State Court litigation.

Second, more than 6 years elapsed between entry of the Judgment and the filing of the Declaratory Relief Action. The Western Energetix information was apparently available from Mr. Dwelle upon request. Morabito and his professionals knew of the importance of the Western Energetix account to Berry Hinckley Industries working capital, but they offer no explanation for not seeking the readily available information for more than 6 years.

Third, and most compelling, is the fact the claimed $3 million working capital issue was only one of several issues upon which the Judgment was based. A review of the Judgment reveals the State Court had numerous concerns regarding the asset purchase agreement and Morabito's conduct. It is unlikely the discrepancies regarding the manner

in which the Herbst Parties accounted for the Western Energetix account as alleged by the Debtors would support a colorable claim for fraud upon the Court. At most, it appears a difference of opinion exists as to how the Western Energetix account should have been treated for accounting purposes. This does not appear to be the type of information that supports a claim for fraud upon a court brought more than 6 years after the alleged fraud occurred.

The Court should deny the Standing Motion because the Debtors have not established colorable claims exist at this time, some 6 year plus after the entry of the Judgment.

**4. THE TRUSTEE HAS NO ASSETS TO PURSUE THE CLAIMS AGAINST THE HERBST PARTIES.**

As the Court is aware, the funds with which the Trustee has been able to hire counsel and other experts in this case to investigate the Debtors' assets and liabilities and to pursue claims on behalf of the Estate have been obtained from Jerry Herbst or one of his affiliates pursuant to two orders authorizing the Trustee to borrow the money (ECF 441 and 598). This is simply the fact of life in significant cases in which few, if any, liquid assets are available to pay for counsel or other experts. The proceeds of the authorized loans have either been fully drawn or are nearly fully drawn. If the Court finds the Debtors have asserted colorable claims against the Herbst Parties and that it is appropriate to grant the Debtors standing to assert the claims under the circumstances that exist in this case, the Court should grant the requested standing because the Trustee does not have the funds to pursue the claims. The only other option for the Trustee is to obtain counsel willing to pursue the claims against the Herbst Parties on a contingency fee basis. At this

time the Trustee has no such counsel available. The undersigned certifies that his law firm is not willing to represent the Trustee in the Declaratory Relief Action on a contingent fee basis.

**5. IF THE COURT FINDS THE STANDING MOTION HAS MERIT, IT SHOULD NOT COMPEL THE TRUSTEE TO ABANDON THE CLAIMS TO THE DEBTORS.**

The Herbst Parties are not the only creditors in this case. The claims docket in the Morabito case reflects three additional claims totaling more than $4,500,000 against the Debtor. Additionally, the Trustee recently filed two avoidance actions (Adv. Pro. Nos. 16-05040 and 16-05041) which, if successful, could result in an additional $775,000 in claims against the Estate. Because this is not a single creditor case it would not be appropriate for the claims against the Herbst Parties, to the extent they exist, to be abandoned to the Debtors. If successful in the Declaratory Relief Action the Debtors will seek sizeable recoveries from the Herbst Parties. If any recoveries on the claims are obtained, the proceeds should inure to the benefit of the Debtors' creditors before the Debtors receive any distributions on account of the claims against the Herbst Parties. For this reason, if the Court finds colorable claims against the Herbst Parties may exist, instead of compelling the Trustee to abandon the claims to the Debtors, the Court should grant the Debtors standing to pursue the claims on behalf of the Estate.

///

///

///

///

**6. CONCLUSION.**

For the reasons stated herein, the Court should deny the Standing Motion.

DATED this 10th day of January, 2017.

WOODBURN AND WEDGE

By ______________________
John F. Murtha, Esq.,
Attorneys for Trustee
William A. Leonard, Jr.

# CERTIFICATE OF SERVICE

I certify that I am an employee of the law firm of Woodburn and Wedge, and that on the 10 day of January, 2017, I caused the foregoing document to be delivered to the below parties by:

__________ placing a true copy thereof in a sealed, stamped envelope with the United States Postal Service at Reno, Nevada

__________ personal delivery

__________ email

__________ Federal Express or other overnight delivery

____✓_____ electronic filing - ECF

addressed as follows:

Frank C. Gilmore
fgilmore@rbsllaw.com

Jeffrey L. Hartman
jlh@bankruptcyreno.com

Beth Gilman, Esq.
beth.gilman@klgates.com

Trey Monsour, Esq.
trey.monsour@klgates.com

Alan R. Smith, Esq.
mail@asmithlaw.com

Mark Weisenmiller, Esq.
mweisenmiller@gtg.legal

Gerald Gordon
ggordon@gtg.legal

__________________________

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

In re:

PAUL A. MORABITO, an individual,

Debtor.

Case No. BK-N-13-51237-GWZ

Chapter 7

VOLUME IV

EXAMINATION UNDER OATH OF PAUL ANTHONY MORABITO, the debtor herein, noticed by Woodburn & Wedge, taken at 1 Park Plaza, Irvine, California, at 10:10 a.m. on Monday, December 5, 2015, before Delia M. Satterlee, CSR 9114.

Job No. 355550

**Q. We can agree to disagree, but we'll move on.**

A. I don't -- am not a resident of Nevada.

**Q. Could you go to page 12 of 28.**

A. Yes, sir.

**Q. This is referencing a claim by the California Franchise Tax Board. It alleges taxes are owed for 2005, -6 and -7. I was aware from your prior statements and schedules that they had asserted taxes for 2005. When did they expand that to 2006 and 2007? Do you know?**

A. I believe in the record you asked that question in 2015, and I answered -- I think as well in 2014 -- that this was all three years.

**Q. Okay. Page 17 of Exhibit 102.**

A. Yes.

**Q. This -- The very first entry is for a claim by JH, Inc./Berry-Hinckley Industries.**

**Do you see that, sir?**

A. Yes.

**Q. And towards the bottom of that, there's a -- a statement describing the claim. Amount under confession of judgment is disputed, 85 million less 9 million in cash and time.**

A. Yes.

**Q. 76 million is disputed. Amount under**

**settlement agreement 21.5 million less 9 million in cash and kind. 12.5 million is not disputed.**

**Do you see that, sir?**

A. Correct.

**Q. Do you state today that you do not dispute $12.5 million of the Jerry Hinck- -- JH, Inc. claim?**

A. I state that as of the date I signed this, I did not dispute that.

**Q. Okay. Do you dispute it today?**

A. Potentially.

**Q. Pardon me?**

A. Potentially.

**Q. On what basis?**

A. On information that I'm hoping to ascertain the accuracy of.

**Q. Okay. The statements and schedules we're looking at right now were dated December 1st, 2016. Something --**

A. That's correct.

**Q. -- has changed?**

A. Yes.

**Q. What has changed?**

A. I had information made available to me that I'm trying to find out if it's actu- -- is accurate and true.

**Q. And what is that information? [QUES]**

A. I'm --

MR. MONSOUR: I object. This is Trey Monsour for Edward Bayuk. To the extent this involves attorney-client privileged information, to the extent it overlaps with our joint defense agreement, I frankly urge your client not to -- to -- to violate that privilege.

MR. GILMORE: Okay. Let's do this. I'll instruct you not to answer anything which requests a conversation or information you had learned through the consultation of counsel -- either myself or counsel which is subject to the joint defense privilege.

THE WITNESS: Okay.

MR. GILMORE: So if -- if the answer to the question requires you to divulge that information, I'll instruct you not to answer.

THE WITNESS: I can't answer because of the attorney-client privilege.

MR. MONSOUR: Thank you.

MR. MURTHA: Okay. I need a copy of the joint defense agreement.

MR. GILMORE: I don't know that you're entitled to it, but we can talk about that at a later time.

MR. MURTHA: Well, if someone's asserting a