GARMAN TURNER GORDON LLP
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail: ggordon@gtg.legal
MARK M. WEISENMILLER, ESQ.
Nevada Bar No. 12128
E-mail: mweisenmiller@gtg.legal
650 White Drive, Ste. 100
Las Vegas, Nevada 89119
Telephone 725-777-3000
Facsimile 725-777-3112
*Attorneys for the Herbst Parties*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>CONSOLIDATED NEVADA CORPORATION,<br><br>Debtor. | Case No.: BK-S-13-51236-GWZ<br>Chapter:  7<br><br><u>Hearing:</u><br>Date:  January 24, 2017<br>Time:  2:00 p.m. |

**OPPOSITION TO MOTION FOR AUTHORITY TO FILE AND PROSECUTE CLAIMS
ON BEHALF OF BANKRUPTCY ESTATE OR, IN THE ALTERNATIVE,
<u>TO COMPEL ABANDONMENT OF CLAIMS</u>**

JH, Inc. ("<u>JH</u>"), Jerry Herbst ("<u>Herbst</u>"), and Berry-Hinckley Industries ("<u>BHI</u>" and collectively with JH and Herbst, the "<u>Herbst Parties</u>"), by and through their counsel, the law firm of Garman Turner Gordon LLP, hereby submit this opposition (the "<u>Opposition</u>") to the *Motion for Authority to File and Prosecute Claims on Behalf of Bankruptcy Estate or, in the Alternative, to Compel Abandonment of Claims* [ECF No.  131] (the "<u>Motion</u>"), filed by Paul A. Morabito ("<u>Morabito</u>") and Consolidated Nevada Corporation ("<u>CNC</u>," and together with Morabito, the "<u>Debtors</u>") on December 27, 2016.  The Motion is supported by the *Declaration of Paul A. Morabito in Support of Motion for Authority to File and Prosecute Claims on Behalf of Bankruptcy Estate or, in the Alternative, to Compel Abandonment of Claims* [ECF No. 132] (the "<u>Morabito Declaration</u>").  The Motion seeks to authorize Debtors and their counsel to prosecute the Complaint, which was filed before the Second Judicial District for the State of Nevada in and for the County of Washoe on December 16, 2016, and removed to this Court on December 23, 2016 [ECF No. 733 in Bankruptcy Case No. 13-51237-GWZ] (the "<u>Complaint</u>").

This Opposition is made and based upon the memorandum of points and authorities set

4824-0311-8912, v. 1

forth below, the declarations of Brian R. Irvine (the "Irvine Decl.") and Mark M. Weisenmiller (the "Weisenmiller Decl."), filed concurrently herewith, the pleadings, papers, and other records on file with the clerk of the above-captioned Court, judicial notice of which is hereby respectfully requested under Federal Rule of Evidence 201, and any argument of counsel entertained by the Court at the time of the hearing on the Motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

Put simply, Morabito is seeking to relitigate the State Court Action now couched as an effort to prosecute on behalf of the Estates causes of action which he acknowledges arose prior to the commencement of the Debtors' bankruptcy cases and are property of the Estates. The crux of Morabito's alleged Claims (defined below) is that — as a result of alleged fraudulent conduct to the tune of $3.6 million (which the Herbst Parties denied during the State Court Action and once again deny), which miraculously through a series of fortuitous Facebook encounters in September 2016, has only now been discovered by Morabito and his counsel, the State Court entered the Judgment; and, had the alleged fraud been known at the time, the Judgment and Confessed Judgment would never have been entered. This is ludicrous and preposterous, and any reasonable person by simply reading the State Court FF&CL and Judgment would arrive at that conclusion. This is nothing more than another Morabito fabrication, which his counsel could and should have obviously realized if they had simply done what is required of them pursuant to FRBP 9011(b) — a reasonable inquiry under the circumstances.

First, the issue of Western Energetix/Nella Oil and BHI and accounts payable/accounts receivable, and the concept of Walt Dwelle as a witness that would help Morabito's position, is nothing new. These exact issues were presented to, considered, and rejected by the independent accountant (the "IA") prior to the issuance of his final working capital calculation in June 18, 2009, which resulted in an order of the State Court on August 12, 2009 confirming the calculation (the "Working Capital Order") that was appealed to the Nevada Supreme Court and dismissed by stipulation of the parties. Despite this, the Debtors sought to unsuccessfully relitigate working capital dispute during the State Court trial, resulting in significant findings of

fact by the State Court.

Second, the alleged Claims are not colorable because: (i) the factual allegations in the Complaint are not plausible considering the 2009 Working Capital Order and the State Court's FF&CL and Judgment entered in September 2010 for fraud; (ii) the alleged Claims are barred by claim and issue preclusion because Morabito raised the factual basis of the alleged Claims to the IA and State Court at the time of the State Court Action and should have raised the alleged Claims in the Confessed Judgment Action; (iii) the Complaint is untimely; and (iv) Debtors lacked standing to file the Complaint.

Third, Morabito failed to disclose the alleged Claims on his schedules or statements, including the amendments filed in December 2016, and provided no information to the Trustee at his 341 meetings, including his continued 341 meeting on December 5, 2016 after he allegedly learned of the alleged Claims by "pure happenstance" in September 2016, months before filing the Complaint on December 16, 2016. Morabito and his counsel knew of the basis for the alleged Claims in 2008 and raised them before the IA and the State Court so there is simply no excuse for failing to disclose the alleged Claims in the Chapter 7 Cases.

Fourth, under the circumstances, the Chapter 7 Trustee's inaction prior to the filing of the Complaint and any similar position taken since the filing of the Complaint cannot be viewed as an abuse of discretion in light of his duties in the Chapter 7 Cases. Thus, the Debtors cannot meet any of the four elements required under applicable law to be granted derivative standing to prosecute the Complaint and the Claims being asserted therein. Consequently, the Motion should be denied.

## II.
## PERTIENENT FACTS

A.     **The Dispute, the Trial, and the State Court Judgment.**

1.     JH and P.A. MORABITO & CO. Ltd. ("PAMCO"), the predecessor-in-interest to CNC, entered into an *Amended and Restated Stock Purchase Agreement* dated June 28, 2007 (the "ARSPA"), whereby JH was to purchase the stock of BHI from PAMCO. Herbst was the guarantor of the JH obligations under the ARSPA, and Morabito guaranteed the obligations of

PAMCO.

2. A dispute developed between Debtors and the Herbst Parties regarding the sale of the BHI stock to JH. Debtors filed a lawsuit against the Herbst Parties on December 3, 2007, captioned *Consolidated Nevada Corp., et al. v. JH. et al*., in Department 6 of the Second Judicial District Court in and for the County of Washoe (the "State Court"), Case No. CV07-02764 (together with all claims and counterclaims, the "State Court Action"). The Herbst Parties filed numerous counterclaims in the State Court Action against Debtors, including, but not limited to, fraud in the inducement, misrepresentation, and breach of contract.

3. On April 17, 2009, Debtors' counsel in the State Court Action, Leif Reid, transmitted a letter to the IA (the "April 17 Letter"), which raised issues that Morabito had with the accounts payable detail the Herbst Parties' included in their working capital report as of July 2, 2007, specifically with respect to liabilities and assets that Morabito contended should have been associated with Nella Oil/Western Energetix, not BHI. See **Exhibit 1** to the Irvine Declaration, ¶ 3.

4. The April 17 Letter requested that the IA speak with the owner of Nella Oil/Western Energetix, Walter Dwelle ("Dwelle"), and that Dwelle would provide an affidavit supporting Morabito's claim. See id.

5. The IA asked that the Debtors provide him with the specific accounts, vendors, transactions or any other detail relating to Debtors' allegations that certain of BHI's reported liabilities were the financial obligation of an entity other than BHI so that the IA could consider and investigate Debtors' claims through their review process. See **Exhibits 1 and 2** to the Irvine Declaration, ¶¶ 3-4.

6. On April 21, 2009, the IA spoke with Dwelle by telephone regarding Morabito's allegations in the April 17 Letter. However, Dwelle suggested that no Nella Oil/Western Energetix accounts payable or other transactions should be in the BHI financials as of July 2007 because the sale closed in January 2007 and any commingling of the companies' activities would have ceased well before July 2007. See id.

7. On April 23, 2009, Shepard Mullin, counsel to the IA, responded to the April 17

Letter, addressing each and every point raised in the April 17 Letter, including the assertions regarding Nella Oil/Western Energetix.  See **Exhibit 3** to the Irvine Declaration, ¶ 5.

8. Morabito often promised to provide an affidavit or other testimony from Dwelle to support his allegations, but never did.  See Irvine Decl., ¶ 6.

9. On June 18, 2009, the IA submitted to the State Court the final working capital report and on August 12, 2009, the State Court entered the Working Capital Order.  See **Exhibit 4** attached to the Irvine Declaration, ¶ 7.

10. On August 19, 2009, the Debtors appealed the Working Capital Order to the Nevada Supreme Court.  See **Exhibit 5** attached to the Irvine Declaration, ¶ 8.  On November 17, 2011, the appeal was dismissed.  See **Exhibit 6** attached to the Irvine Declaration, ¶ 9.

11. On or about March 26, 2010, Jones Vargas, counsel for the Herbst Parties, filed with the State Court the *[Second] Amended Expert Report of Craig l. Greene, CPA/CFF, CFE, MCJ* (the "Expert Report").  See **Exhibit 7** to the Irvine Declaration, ¶ 10.

12. One excerpt of the Expert Report (pages 20 and 21) further substantiates that the Nella/Western Energetix transaction with BHI was fully explored and investigated.  A second excerpt from the Expert Report (pages 81 and 82) illustrates that the Nella Oil/Western Energetix transaction actually harmed BHI because of the losses inherent in the undisclosed agreement regarding the cost of fuel.  Finally, another excerpt from the Expert Report (Exhibit 16) evidences the third component of damages, $66,002,205.75, awarded by the State Court in the Judgment as more particularly described below.  See id.

13. The State Court Action was tried before the Honorable Judge Brent Adams by way of a bench trial commencing May 10, 2010 and lasted several weeks.

14. On October 12, 2010, the State Court entered findings of fact and conclusions of law (the "FF&CL") in the State Court Action, which specifically set forth the legal and factual basis for judgment against Morabito for fraud in the inducement.  The State Court concluded that Morabito and CNC defrauded the Herbst Parties in three (3) specific ways and awarded damages for two components, which totaled $85,871,363.75.  See **Exhibit 8** attached to the Irvine Declaration, ¶ 11.

15. As to the Herbst Parties' fraud allegations with respect to Morabito's representations regarding construction manager services in the CMA, the State Court concluded that in the FF&CL:

> **2. Fraud in the Inducement**
>
> 69. The Court finds by clear and convincing evidence that Mr. Morabito never for a single second had any intention to perform the services of construction manager.
>
> 70. Mr. Morabito's representations under the CMA were intentionally false.
>
> …
>
> 73. As a result, [the Herbst Parties] have been damaged in the sum of $19,869,159.

See id. at ¶¶ 69-70, 73 (citations omitted).

16. With respect to the Herbst Parties' losses due to Morabito's fraud as a result buying BHI, including consideration of BHI's monthly losses, accounts payable, and the working capital estimate, the State Court also concluded in the FF&CL that:

> 34. Clear and convincing evidence shows that there was no basis whatsoever for the contents of the working capital estimate other than Mr. Morabito's decision to create it.
>
> 35. There is not one piece of paper that has been produced in over 5,500 exhibits in this trial, to the Independent Accountants, during discovery or anywhere else, to support the exaggerated value of the company as set forth in the working capital estimate.
>
> 36. The major difference between Mr. Morabito's estimate and the actual working capital is accounts payable. This fact is significant.
>
> 37. The Court is very impressed with the testimony of Paula Meyer. Ms. Meyer worked for BHI since approximately 1995. She worked for years under the direction of Mr. Hinckley, who impressed the Court as an honest and fine business person. Ms. Meyer is also a CPA and was the CFO of BHI. Ms. Meyer graduated from the University of Nevada, Reno and was an accountant at Grant, Thornton.
>
> …
>
> 43. In the course of events leading to the closing of this transaction, there was a point where Mr. Morabito wanted Ms. Meyer to communicate only with him and not the lawyers or BCC. This is a small fact, but it is an unusual fact. This is a complex transaction involving tens of millions of dollars. As the CFO, Ms. Meyer had access to the financial statements of the company while the CEO of the company, Mr. Morabito, did not have such access. Nevertheless, Mr. Morabito

instructed Ms. Meyer to only communicate with him. Thus, the buyer was deprived of access to Ms. Meyer (who knew the true financial condition of the company) and had to rely exclusively on the false working capital estimate prepared by Mr. Morabito.

44. Ms. Meyer testified that she did not know what happened to information once it went to Mr. Morabito. Mr. Morabito handled the majority of the information.

45. Ms. Meyer's testimony regarding her constant disputes and disagreements with Paul Morabito about the accounts payable was very moving.

46. It is not enough to say Ms. Meyer constantly had disagreements with Mr. Morabito about the amount of accounts payable. Ms. Meyer's anxiety and fear of this man because of his relentless, torturous attacks on her to drive down the accounts payable was almost palpable as she testified. Her testimony sounded more like the accounts the Court hears in cases of spousal abuse than in cases of commercial transactions.

47. Ms. Meyer was then shown the document prepared by Mr. Morabito and she knew in the flicker of an eye that it was way off.

48. Ms. Meyer testified that monthly accounts payable should have been in the range of at least five to six million. Ms. Meyer had no idea why Mr. Morabito made the representation he did.

49. Mr. Morabito always thought accounts payable should be lower. It was always a battle back and forth between Mr. Morabito and Ms. Meyer.

50. Mr. Stanton Bernstein, Mr. Morabito's personal accountant, agreed with Ms. Meyer regarding accounts payable.

51. Ms. Karen Scarborough, the BHI controller, also agreed with Ms. Meyer.

53. On or about March 8, 2007, the accounts payable totaled $7,405,342.33.
…
55. Ms. Meyer told Mr. Morabito on the telephone many times that she knew the payables were way too low.
…
59. The working capital estimate Mr. Morabito gave the buyer had no basis in reality. It was contrary to what he knew firsthand to be the truth.
…
93. Clear and convincing evidence shows that there was no basis whatsoever for the contents of the working capital estimate other than Mr. Morabito's decision to create it. [The Herbst Parties] proved, by clear and convincing evidence, that Mr. Morabito's statements of working capital were false and known by him to be false, that [the Herbst Parties] reasonably relied on Mr. Morabito's statements of working capital, and were damaged thereby.

4824-0311-8912, v. 1

94. Generally speaking, an estimate of value cannot be the basis for a legal claim for fraud or other misconduct. However, the circumstances in this case are different.

> a. First, the estimate was prepared by Mr. Morabito, the owner of the company.
>
> b. Second, the estimate was significantly and materially inconsistent with the information he was given firsthand by his chief financial officer and by his personal accountant.
>
> c. Third, there is no evidence that anyone else reviewed the estimate that was prepared by Mr. Morabito.

95. There is simply no other conclusion available than the working capital report that was prepared by Mr. Morabito was intentionally false, was done for the purpose of [the Herbst Parties] relying on it, and that [the Herbst Parties] did reasonably rely on it.

96. There is no data in the company to support the working capital estimate.

97. Mr. Morabito knew firsthand from his own employees and from his own accountant that it was incorrect.

98. The working capital estimate was materially inflated and falsely inflated the value of the company, and that became apparent shortly after close of the transaction.

…

103. In December of 2006, [the Herbst Parties] were told BHI was losing about $600,000 a year. [Debtors'] own analysis indicated the company was losing approximately $1.5 million a year. In relatively short order, it turns out the company was losing approximately $1 million a month. Thus, it is reasonable, as Mr. Greene suggested, to extrapolate from performance to the truthfulness or untruthfulness of the representations concerning the value of BHI.

104. This evidence is not sufficient to warrant a finding of fraud or to award damages with respect to the representations of the value of BHI.

105. However, these facts demonstrate that had Defendants known the truth about the working capital, they would not have bought the company

106. The Court, having found that defendants were fraudulently induced, awards damages to [the Herbst Parties] and against [the Morabito Parties] in the amount of $66,002,205.75.

See id. ¶¶ 34-37, 43-51, 55, 93-98, 103-06 (citations omitted).

17. Based upon the FF&CL, the State Court awarded total compensatory damages to

the Herbst Parties in the amount of $85,871,364.75 for fraud in the inducement. See id. at 14-15.

18. After discovery, the State Court entered a judgment awarding the Herbst Parties total damages in the amount of $149,444,777.80, representing both compensatory and punitive damages (the "State Court Judgment") on August 23, 2011.

19. After entry of the State Court Judgment, Debtors filed numerous appeals with the Nevada Supreme Court, denominated as Supreme Court Case Nos. 57943, 57944, 59138, and 54412. The Herbst Parties also filed numerous cross-appeals (together with the appeals filed by Morabito, the "Appeals").

**B.     Settlement Agreement, Default, and Confessed Judgment.**

20. The Herbst Parties and Debtors, with the advice of counsel, agreed to settle the State Court Action and the Appeals and, on November 30, 2011, executed the *Settlement Agreement and Mutual Release* (the "Settlement Agreement").

21. Pursuant to the Settlement Agreement and subsequent to its execution, the Appeals were vacated, as were the State Court Judgment and the FF&CL.

22. As part of the Settlement Agreement, Morabito agreed to (i) make several cash payments to the Herbst Parties, (ii) assume certain obligations of the Herbst Parties, (iii) indemnify, defend, and hold harmless the Herbst Parties for certain claims in certain actions, and (iv) list for sale certain real property for the benefit of the Herbst Parties.

23. As part of the Settlement Agreement, Morabito also agreed to execute (i) a confession of judgment for $85,000,000 (the "Confession of Judgment") which included a statement of facts and conclusions of law from the FF&CL which were subsequently vacated.

24. Morabito defaulted under the terms of the Settlement Agreement as a result of his failure to timely comply with the terms of the Settlement Agreement, including his failure to pay to the Herbst Parties the cash payment of $4,000,000 due on or before March 1, 2013 (the "Continuing Defaults").

25. Morabito thereafter requested that the Herbst Parties forbear from exercising their rights and remedies under the Settlement Agreement with respect to the Continuing Defaults until December 1, 2013.

26. Accordingly, Morabito and the Herbst Parties, with the advice of counsel, entered into that certain Forbearance Agreement dated March 1, 2013 (the "Forbearance Agreement").

27. As a result of Morabito's breach of the Settlement Agreement and Forbearance Agreement, the Herbst Parties filed with the Clerk of the State Court the Confession of Judgment and the Stipulation of Nondischargeability on June 18, 2013 (the "Confessed Judgment Action").

28. The Confessed Judgment was entered onto the judgment roll by the Clerk of the State Court.

29. The State Court in the Confessed Judgment Action held that the filing of the Confessed Judgment was proper and in compliance with the applicable Nevada Revised Statutes.

30. Morabito's challenges to the Confessed Judgment were also denied by the Nevada Supreme Court.

31. The time to appeal the Confessed Judgment has expired.

**C.  The Involuntary Proceedings.**

32. On June 20, 2013 (the "Petition Date"), the Herbst Parties filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code [ECF No. 1] (the "Involuntary Petition"), thereby commencing a Chapter 7 involuntary proceeding (the "Involuntary Proceeding") against CNC.

33. On December 22, 2014, the Court entered its *Amended Order for Relief Under Chapter 7* [ECF No. 63].

**D.  Debtors' Schedules, Statements, and 341 Meetings.**

34. Debtors did not list the alleged Claims in their schedules or statements, which were amended several times, and did not provide any information to the Chapter 7 trustee at their 341 meetings, including Morabito's continued 341 meeting conducted on December 5, 2016, just ten-days prior to the filing of the Complaint. See ECF Nos. 88. See also ECF Nos. 211, 237-38, 249, 685, 687 in 13-51237-GWZ; **Exhibit 9** to the Weisenmiller Declaration for the relevant portions of the continued 341 meeting transcript.

**E.  The Nondischargeability Action.**

35. On March 20, 2015, the Herbst Parties commenced an adversary proceeding (the

10

4824-0311-8912, v. 1

"Adversary Proceeding") by timely filing their complaint objecting to Morabito's discharge pursuant to Sections 523(a)(2)(A) and 523(a)(2)(B) and 28 U.S.C. § 2201 [ECF No. 1 in 15-05019-GWZ] (as amended by ECF No. 8 in 15-05019-GWZ, the "Nondischarge Complaint").

36. At his deposition on February 10, 2016, Morabito testified that the State Court Judgment was unfounded and demonstrably false, not because the Herbst Parties committed fraud with respect to the working capital estimate, but because Judge Adams' court was a sham and Judge Adams solicited and took bribes. See **Exhibit 10** attached to the Weisenmiller Declaration for the relevant portions of the deposition transcript.

37. Even though Morabito knew of the factual basis of his alleged Claims in 2008-09, raised them with the IA, and appealed the Working Capital Order to the Nevada Supreme Court, Morabito did not raise them during the Adversary Proceeding or in his opposition to the Herbst Parties' *Motion for Partial Summary Judgment* [ECF No. 33 in 15-05019-GWZ]. See ECF Nos. 7, 10, 42-46, 53, 55, 66, 73, 76 in 15-05019-GWZ. Instead, Morabito decided to assert a fortuitous Facebook encounter in September 2016 as the first time he became aware of a problem with the accounts payable involving Western Energetix/Nella Oil.

38. The Herbst Parties were awarded summary judgment based upon issue and claim preclusion as a result of the Confessed Judgment on September 22, 2016. See ECF Nos. 59-60 in 15-05019-GWZ.

**F.    The Complaint.**

39. On December 16, 2016, Debtors, whose counsel apparently conducted no due diligence prior to filing the Complaint, filed the Complaint in the Second Judicial District for the State of Nevada in and for the County of Washoe. See Complaint.

40. In the Complaint, Debtors aver causes of action against the Herbst Parties for: (1) Fraud on the Court; (2) NRCP 60(b)(3) – Fraud; (3) Fraudulent Inducement; and (4) Fraudulent Misrepresentation (collectively, the "Claims"), and seek a declaratory judgment that the Confessed Judgment is unenforceable because it is based upon the State Court Judgment, which was obtained by the Herbst Parties' fraud with respect to BHI's accounts payable and financial statements and the working capital estimate. See id. at 23-26.

41. More specifically, Debtors allege that the Herbst Parties defrauded Debtors, the IA, and the State Court because they fraudulently included assets and liabilities of Nella Oil/Western Energetix on BHI's financial statements and their working capital estimate. See id. at 2-3, 10-14.

## III.
## LEGAL ARGUMENT

**A.   The Request for Derivative Standing is Without Merit.**

A trustee, including the debtor-in-possession, is both authorized and has the duty to manage the property of the bankruptcy estate. See Louisiana World Exposition v. Fed. Ins. Co., 858 F.2d 233, 245 (5th Cir. 1988). This includes collecting the property of the bankruptcy estate to maximize its value. See id. at 246. The trustee is dutybound to assert claims or causes of action on behalf of the bankruptcy estate if doing so will maximize the estate's value. See id. Nevertheless, "[i]t is well settled that in appropriate situations the bankruptcy court may allow a party other than the trustee or debtor-in-possession to pursue the estate's litigation." See In re Spaulding Composites Co., Inc., 207 B.R. 899, 903 (9th Cir. B.A.P. 1997) (citing Louisiana World, 858 F.2d at 247–52 n. 19 (and cases cited therein)); see also In re Catwil Corp., 175 B.R. 362, 364 (Bankr. E.D. Cal. 1994) ("Although the Code does not contain a parallel section that authorized a creditors' committee to initiate adversary proceedings, courts have held that sections 1103(c)(5) and 1109(b) imply such a right."). Specifically, courts permit a creditor or committee to pursue avoidance actions where the trustee or debtor-in-possession has refused to do so. See COLLIER ON BANKRUPTCY ¶ 323.03 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2016).

A majority of the Federal Circuit Courts of Appeal have held that derivative standing is available in bankruptcy proceedings. The Circuit Courts have generally required that the court must expressly authorize standing, and may do so where the trustee or debtor-in-possession is found to be unwilling or unable to assert the claims or causes of action on behalf of the estate, and granting derivative standing to pursue the claims is likely to benefit the estate. Courts such as the Sixth Circuit in In Canadian Pacific Forest Products, Ltd. v. J.D. Irving, Ltd. (In re Gibson

Group, Inc.) 66 F.3d 1436, 1438-1446 (6th Cir. 1995) have recognized a test loosely comprised of four prongs, finding that a party may have derivative standing to initiate actions beneficial to the estate where: (1) a demand made upon trustee or debtor-in-possession to act; (2) the demand is declined; (3) the claim is colorable and would benefit the estate based on a cost-benefit analysis; and (4) inaction is an abuse of discretion. See id.

While other courts have undertaken analyses while nominally identifying different prongs, they nevertheless revolve around whether the trustee or debtor-in-possession has unjustifiably refused to pursue a colorable claim that would benefit the estate. See, e.g., Unsecured Creditors Committee of Debtor STN Enterprises v. Noyes (In re STN Enterprises), 779 F.2d 901 (2nd Cir. 1985) (court may approve committee's right to initiate suit where unjustifiable failure to bring colorable avoidance action likely to benefit estate); In in re McKeesport Steel Casting Co., 799 F.2d 91, 94 (3rd Cir. 1986); Louisiana World, 858 F.2d at 247, 252 (standing may be granted where (1) claim at issue colorable, (2) debtor-in-possession or trustee has unjustifiably refused to pursue, and (3) committee pursues court approval); In In re Perkins, 902 F.2d 1254, 1258 (7th Cir. 1990) (derivative standing is appropriate when three elements are met: (1) the trustee unjustifiably refuses a demand to pursue the action, (2) the creditor establishes a colorable claim or cause of action, and (3) the creditor seeks and obtains leave from the bankruptcy court to prosecute the action for and in the name of the trustee).

Within the Ninth Circuit, the Sixth Circuit's Canadian Pacific four-prong test was expressly acknowledged by the Montana Bankruptcy Court in In re Yellowstone Mountain Club, LLC, No. 08-61570-11, 2009 WL 982207, at *2 (Bankr. D. Mont. Jan. 16, 2009), which found that, in determining whether to confer derivative standing, courts often consider whether (1) a demand had been made upon the statutorily authorized party to take action, (2) the demand is declined, (3) a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court, and (4) the inaction is an abuse of discretion in light of the debtor-in-possession's duties in a Chapter 11 case. See id. (citing In re Valley Park, 217 B.R. 864, 866 (Bankr. D. Mont. 1998) and Canadian Pacific, 66 F.3d at 1436). See also In re Alaska Fur Gallery, Inc., No. A09-00196-DMD, 2010 WL 7765571, at *1 (Bankr. D. Alaska May 21,

4824-0311-8912, v. 1

2010) (adopting Canadian Pacific analysis).

Here, the Motion should be denied because the Complaint is without a basis in law or fact and the Motion is premised on another Morabito fabrication.

1. **The First and Second Elements Necessary for the Motion to be Granted Have Not Been Satisfied.**

The first two required elements for derivative standing cannot be satisfied because Debtors made no demand upon the Chapter 7 Trustee appointed in the Chapter 7 Cases and, as such, the Chapter 7 Trustee did not decline any demand by Debtors. Instead, Morabito failed to disclose the alleged Claims in his schedules and statements filed in the Chapter 7 Cases, which were amended several times over several years, and refused to provide any detail regarding the alleged Claims at his 341 meetings, including his continued 341 meeting on December 6, 2016. In fact, at Morabito's continued 341 meeting, the Chapter 7 Trustee specifically asked if Morabito knew of any basis to object to the Herbst Parties' claim. While Morabito suggested that he had a basis, he declined to share it with the Chapter 7 Trustee. Just ten-days later, Debtors filed the Complaint in the State Court.

Morabito alleges in the Motion and Complaint that he discovered the factual basis of the alleged Claims "in recent weeks," by "pure happenstance," after he received a Facebook friend request from the "nephew and brother of the CEO of Western Energetix, LLC, Walter Dwelle." See Motion at 2:9-10; Complaint, ¶ 8. However, Morabito claimed on multiple occasions in 2008 and 2009 prior to the IA's final working capital calculation that the IA needed to speak to Walt Dwelle and Nella Oil/Western Energetix because the purchase of Western Energetix by Nella Oil from BHI impacted the BHI balance sheets in that Western Energetix's accounts payable continued to show up on BHI's balance sheets. Morabito raised the theory to the IA during the State Court Action on April 17, 2009, by letter from his counsel. Morabito also often promised to provide an affidavit or other testimony from Dwelle explaining the situation to the IA, but never did. Eventually, the IA interviewed Dwelle and indicated that Dwelle did not say anything that supported Morabito's claims.

Simply put, Morabito is attempting to rehash issues that were previously raised and

14

considered by the IA and the State Court in the State Court Action. The transaction with Nella Oil/Western Energetix was fully investigated and explored by the IA and the Stat Court, but Morabito's allegations were rejected by the IA and the State Court because he could not produce documentary evidence or testimony to support his claims. Morabito is attempting to retry the State Court Action with his selective "factual allegations" in the Complaint. See Irvine Decl. ¶ 12.

Morabito's prior knowledge of the factual basis of the alleged Claims demonstrates that Morabito has lied to this Court again and his counsel conducted no due diligence before filing the frivolous Complaint. Moreover, Morabito's knowledge is also substantial evidence showing that the Motion should be denied because the Debtors failed to meet the third and fourth factors.

2. **The Third Element Necessary for the Motion to be Granted Has Not Been Established.**

Debtors also failed to satisfy the third required element — that a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court — with respect to the Claims alleged against the Herbst Parties in the Complaint. First, the alleged Claims are not colorable because they are barred by claim and issue preclusion — Morabito raised the factual basis for the alleged Claims in the State Court Action and could have raised them in the Confessed Judgment Action, which resulted in a final judgment on the merits. See Five Star Capital Corp. v. Ruby, 124 Nev. 1048, 1054-55, 194 P.3d 709, 713 (2008) (providing requirements for claim and issue preclusion under Nevada law).

Second, the alleged Claims are not colorable because they are not plausible in view of the Working Capital Order, State Court FF&CL and Judgment. The dispute over the working capital estimate was but one distinct occurrence of fraud that the Herbst Parties alleged against Morabito in the State Court Action. The FF&CL and Confessed Judgment demonstrate that the State Court also found that Morabito fraudulently induced the Herbst Parties to enter into the ARSPA through intentional misrepresentations with respect to services he promised to provide as construction manager and in the CMA, as to BHI's value, and with respect to the working capital estimate, which was a separate award based upon the IA's report that was affirmed by the State

4824-0311-8912, v. 1

Court on August 12, 2009 and incorporated into the Judgment. Thus, even if Morabito's salacious allegations are true, which they are not, the difference would be approximately $3 million of the initial $85,871,364.75 million Judgment.

Further, the FF&CL make clear that the State Court did not rely solely upon the BHI financial statements or working capital estimate produced by the Herbst Parties or the opinion of the IA. Rather, the State Court relied upon the testimony of: (i) Paula Meyer, who worked for BHI since approximately 1995, was a CPA and CFO of BHI, and who testified regarding her constant disputes and disagreements with Morabito about the accounts payable, which she believed were understated by Morabito; (ii) Stanton Bernstein, Morabito's personal accountant, who agreed with Ms. Meyer regarding the accounts payable; and (iii) Karen Scarborough, the BHI controller, who also agreed with Ms. Meyer. See FF&CL. Therefore, the alleged Claims are not colorable because they are not plausible. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007); Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).

Third, the alleged Claims are not colorable because they are untimely. Section 108(a) provides that, "[i]f applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the **trustee** may commence such action only before the later of—(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or (2) two years after the order for relief." 11 U.S.C. § 108(a) (emphasis added). Here, the Chapter 7 Trustee did not commence the alleged Claims prior to expiration of the limitations period. As such, the alleged Claims are untimely.

Fourth, the alleged Claims are not colorable because Debtors lacked standing to file the Complaint. The Bankruptcy Code establishes that the trustee is the "representative of the estate" and thus "has the capacity to sue and be sued." See 11 U.S.C. § 323. In Spritos, the Ninth Circuit held that "11 U.S.C. § 323 vests the bankruptcy trustee with the exclusive right to sue on behalf of the bankruptcy estate." Estate of Spirtos v. One San Bernardino Cty. Superior Court

4824-0311-8912, v. 1

Case Numbered SPR 02211, 443 F.3d 1172, 1174 (9th Cir. 2006) (finding that a creditor of a bankruptcy estate does not have standing to file a complaint on behalf of the estate unless permission from the trustee is obtained). Additionally, a Chapter 7 debtor has no standing to sue because when a Chapter 7 trustee was appointed, the Chapter 7 trustee is vested with all of the debtor's causes of action. See In re Eisen, 31 F.3d 1447, 1451 n.2 (9th Cir. 1994) (finding that "as trustee, Moneymaker is vested with Eisen's [the debtor's] causes of action, rendering Eisen with no standing to appeal").

Thus, Debtors failed to satisfy the third necessary element applicable to the Motion.

### 3. **The Fourth Element Necessary for the Motion to be Granted Has Not Been Established.**

The fourth factor — whether the Chapter 7 Trustee's inaction is an abuse of discretion in light of his duties in the Chapter 7 Cases — cannot be established under the circumstances. The "inaction" of the Chapter 7 Trustee was the result of Debtors' failure to disclose the alleged Claims in his schedules and statements or otherwise inform the Chapter 7 Trustee of the alleged Claims any time prior to the statute of limitations period running. As detailed herein, Morabito knew of the factual basis supporting his alleged Claims in 2007-08, well before the Petition Date, and was specifically asked on December 5, 2016, whether he had a basis to dispute the Herbst Parties' claim. However, he declined to do so, electing instead of file the Complaint. Consequently, the Chapter 7 Trustee's "inaction" was the expected result of Morabito gamesmanship, which he should not benefit from.

Therefore, the Motion should be denied because Debtors failed to satisfy any of the four requirements elements to be entitled derivative standing.

### B. **The Request for Abandonment of the Alleged Claims Must Be Denied.**

First, Debtors' request that the Court compel the Chapter 7 Trustee to abandon the alleged Claims should be denied because Debtors failed to provide any legal authority to support their request. See Romero v. Nevada Dept. of Corrections, 2013 WL 6206705 (D. Nev. 2013) ("[J]udges are not like pigs, hunting for truffles in briefs. Nor are they archaeologists searching for treasure. Put simply, the Court is not obligated to paw over files ... in order to make a party's

17

4824-0311-8912, v. 1

claim."); Kelly v. Target Corp., No. 2:13-CV-1859-KJD-NJK, 2014 WL 4206854, at *1 (D. Nev. Aug. 25, 2014) ("Plaintiff fails to oppose any factual or legal claim made by Defendant, constituting consent to the granting of the motion under Local Rule 7–2(d).").

Second, with respect to a motion under Section 554(b), "an order compelling abandonment is the exception, not the rule." See In re Viet Vu, 245 B.R. 644, 647 (9th Cir. B.A.P. 2000). "Abandonment should only be compelled in order to help the creditors by assuring some benefit in the administration of each asset.... Absent an attempt by the trustee to churn property worthless to the estate just to increase fees, abandonment should rarely be ordered." See id. (citing In re K.C. Mach. & Tool Co., 816 F.2d 238, 246 (6th Cir. 1987)). Moreover, when an objection is made, the burden of proof is upon the movant seeking abandonment. See 5 COLLIER ON BANKRUPTCY ¶ 554.02[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (citing In re Pilz Compact Disc., 229 B.R. 630 (Bankr. E.D. Pa. 1999)).

Here, Morabito's bad faith, misrepresentations, and gamesmanship during the Chapter 7 Cases disqualify Debtors from receiving the benefit of an order under Section 554(b). Further, Debtors failed to meet their burden under Section 554(b). The only evidence filed in support of the Motion was the Morabito Declaration, which makes little sense, is mostly based upon hearsay and not personal knowledge, and is simply a rehash of arguments previously rejected by other courts. Furthermore, any declaration Morabito submits should be viewed with significant skepticism considering the numerous times Morabito has been caught lying in the Chapter 7 Cases. Thus, the request for abandonment should be denied for Debtors' failure to meet their burden under Section 554(b).

Third, to the extent Debtors' request for abandonment is under Section 554(c), Debtors' request should be denied because Debtors failed to schedule or otherwise disclose the alleged Claims and the Chapter 7 Cases are not closed. See 11 U.S.C. § 554(c) ("[u]less the court orders otherwise, any property scheduled under 521(1) of this title ... not otherwise administered at the time of the closing of a case is abandoned to the debtor."); In re Kreisel, 399 B.R. 679, 687–88 (Bankr. C.D. Cal. 2008) (citing 11 U.S.C. § 554(c) (2008) (property subject to abandonment must be scheduled); Moreno v. Autozone, Inc., No. C05-04432MJJ, 2007 WL 1063433, at *3

4824-0311-8912, v. 1

(N.D. Cal. Apr. 9, 2007) (holding that a debtor lacked standing to bring claims against her former employer because such claims were never scheduled and therefore could not be abandoned)).

Thus, the request to compel the Chapter 7 Trustee to abandon the alleged Claims should be denied.

### III.
### CONCLUSION

Based upon the forgoing, the Court should deny the Motion, and grant any further relief that is appropriate.

DATED this 10th day of January, 2017.

                                                GARMAN TURNER GORDON LLP

                                                */s/ Mark M. Weisenmiller*            .
                                                GERALD M. GORDON, ESQ.
                                                MARK M. WEISENMILLER, ESQ.
                                                *Attorneys for the Herbst Parties*

4824-0311-8912, v. 1