1  Kent R. Robison, Esq. (SBN 1167)
   krobison@rbsllaw.com
2  Frank C. Gilmore, Esq. (SBN 1 0052)
   fgilmore@rbsllaw.com
3  ROBISON, BELAUSTEGUI, SHARP & LOW
   71 Washington Street
4  Reno, Nevada 89503
   Telephone: (775) 329-3151
5
   David B. Shemano, Esq. (admitted *pro hac vice*)
6  DShemano@RobinsKaplan.com
   ROBINS KAPLAN LLP
7  2049 Century Park East, Suite 3400
   Los Angeles, CA  90067
8  Telephone: (310) 552-0130

9  Attorneys for Consolidated Nevada Corporation

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No.  BK-N-13-51236-GWZ |
| CONSOLIDATED NEVADA CORPORATION, a Nevada corporation, | Chapter 7 |
| Debtor. | Date: January 24, 2017<br>Time: 2:00 p.m. |

**REPLY IN SUPPORT OF MOTION FOR AUTHORITY TO FILE AND PROSECUTE CLAIMS ON BEHALF OF BANKRUPTCY ESTATE OR, IN THE ALTERNATIVE, TO COMPEL ABANDONMENT OF CLAIMS**

61278965.2

Paul A. Morabito (the "Debtor" or "Morabito") and Consolidated Nevada Corporation ("CNC," and together with the Debtor, the "Debtors"), hereby submit their reply in support of the motion for authority to file and prosecute certain fraud and fraudulent transfer claims (the "Fraud Claims") on behalf of their bankruptcy estates against JH, Inc. ("JH"), Jerry Herbst ("Herbst," and collectively with JH, the "Herbsts"), and Berry-Hinckley Industries ("BHI"), or, in the alternative, to compel abandonment of the Fraud Claims.

## I.

### THE MOTION SHOULD BE GRANTED BECAUSE THE TRUSTEE CONCEDES HE WILL NOT PROSECUTE THE CLAIMS UNDER ANY CIRCUMSTANCES

The chapter 7 trustee (the "Trustee") and the Herbsts rightly point out in their objections that the right to prosecute an estate cause of action presumptively belongs to the trustee. For that reason, a party other than the trustee may only be authorized to prosecute an estate claim if the trustee is unwilling to bring the action.

While the Trustee spends several pages citing the relevant case law, and purports to object to the Motion, the Trustee explicitly states that he will not prosecute the claims even if meritorious because he does not have the funds to prosecute the claims. In fact, the Trustee expressly states that if colorable claims exist, "the Court should grant the requested standing." Trustee's Response, p. 12, line 22.

Accordingly, the question before the Court is not whether the Fraud Claims should be prosecuted by the Trustee or third parties, because the Trustee explicitly represents that he will not prosecute the Claims. The only question is whether the Claims should be prosecuted by the Debtors on behalf of the estates or should be abandoned and then prosecuted by the Debtors on behalf of the Debtors.

## II.

### THE FRAUD CLAIMS ARE COLORABLE

The Trustee and the Herbsts argue the Motion should be denied because the Fraud Claims are not colorable. As evidenced by the Herbsts' very deceptive objection to the Motion, the

Fraud Claims are not merely colorable, but compelling.

Simplified to its core, the Debtors allege that Herbsts fraudulently manipulated BHI's financial statements to omit several million dollars of current assets from the balance sheet as of the closing date of the ARSPA transaction. Those assets were reimbursement obligations owed by Western Energetix ("WE") related to the sale of fuel from card-locks located at five of the BHI convenience stores and the use of card-lock fuel network charge cards at all of the BHI convenience stores, which card-lock assets were acquired by WE from BHI as part of the January 2007 acquisition. The Debtors allege that instead of crediting those obligations against the payable owed by BHI to WE for fuel purchases (as was done when the Debtors prepared BHI's financial statements through April 2007), or treating those obligations as accounts receivable on the financial statements, the Herbsts fraudulently omitted the asset from the May and June 2007 pre-closing financial statements they prepared, which fraudulent financial statements were relied upon by the Independent Accountants and the State Court in concluding that the Debtors' working capital estimate was a baseless fiction.

### A. Whether Or Not The Debtors Should Have Discovered The Fraud At Trial Should Be Determined By The State Court

The Trustee argues that the Motion should be denied because the Debtors do not explain why they did not discover the Herbsts' fraud during the State Court Action. Trustee's Response, pp. 10-11.

The Debtors acknowledge that whether or not the Debtors should have discovered the Herbsts' fraud during the State Court Action will be an important issue when the Fraud Claims are prosecuted. But whether or not the Debtors should have previously discovered the Herbsts' fraud is a disputed factual issue that should be adjudicated by the trier of fact after consideration of all relevant evidence, and not this Court, whose only task is to ensure that the underlying claim is colorable, meaning the claim could survive a motion to dismiss for failure to state a claim.

While the reasons the fraud was not caught at the time is not at issue with respect to this Motion, the reasons are understandable in hindsight. The Herbsts' fraud was very sophisticated and practically undiscoverable except if a knowledgeable party assumed and then carefully

looked for a fraud. At the time of the trial, there were a multitude of disputed issues, but it never occurred to Morabito that the Herbsts, who were either licensed or applicants before the Nevada Gaming Control Board ("NGCB"), and who had Herbst Gaming, Inc., pay a $1 million deposit, would risk their existing and pending gaming licensing with the NGCB by fabricating financial statements.

With the benefit of hindsight, Morabito is embarrassed that he was fooled and did not discover the fraud at the time. It never occurred to Morabito at the time of the State Court Action to check on the calculation of the reported receivables to determine if the reimbursement obligation owed by WE was included, because the reimbursement obligation had never been recorded as a receivable when Morabito was provided the financial statements through April 2007, and Morabito had not authorized or been advised of any change in that accounting procedure when the Herbsts prepared the May and June 2007 financial statements. The receivable calculation was never a disputed issue at the trial, nor was the card-lock reimbursement procedure – the entire focus was on the payables.

Morabito did review and challenge the calculation of the payables, but not because of concern the reimbursement obligation was not credited against the payables. Morabito believed (wrongfully in hindsight) that the BHI accounting staff had timely credited the obligation in May and June 2007 as had previously been done. Instead, Morabito was focused on the lingering balance sheet effects of the sale of the wholesale assets to WE in January 2007, and whether there were payables on the balance sheet that were actually owed by WE and not BHI. It simply never occurred to Morabito that the Herbsts would have fraudulently omitted the reimbursement obligations related to the card-lock assets from the pre-closing financial statements.

The lightbulb only went off when Walt Dwelle told Morabito in early December 2016 that the $3.361 million negative adjustment to BHI's payable to WE reflected on BHI's 2007 audited financials was unrelated to any extraordinary transaction and that WE's only relationship with BHI at and after the ARSPA closing was ordinary fuel sales and haulage. Morabito was shocked, because Morabito was aware that in a 2008 audit of the 2007 financials, the $3.361 million negative adjustment is identified as related to the Chevron-Texaco branded jobber agreement (the

1  "Chevron Jobber Agreement"), which WE purchased the right to acquire from BHI as part of the
2  January 2007 transaction and then the Herbsts had the option to purchase from WE as part of the
3  ARSPA. The accounting adjustment would have made logical sense if the Herbsts had exercised
4  the WE option, thereby creating a payable owed to WE, but then entered into a post-closing
5  agreement with WE that reduced that payable. However, Dwelle confirmed to Morabito that the
6  Herbsts never exercised the option at all, so there was never a Chevron Jobber Agreement
7  purchase price payable to WE to be reduced.

8  In trying to figure out the audit adjustment, Dwelle suggested to Morabito that perhaps the
9  audit adjustment related to the reimbursement obligations routinely offset against the fuel
10 invoices wherein WE recorded a negative accounts receivable with BHI that reflected the money
11 WE owed BHI for card-lock related sales. Alan Breese, who was WE's CFO at the time of the
12 ARSPA closing, added that he recalled that BHI's accounting of the reimbursement obligation in
13 the weeks prior to the July 2007 closing was not timely as key BHI staff quit pre-closing, and that
14 some of the pre-closing obligations were not addressed until well after the July 2007 closing with
15 the Herbsts.

16 The communications with Dwelle and Breese caused Morabito for the first time to wonder
17 if there was something wrong with the accounting of the reimbursement obligations in connection
18 with the State Court Action. Morabito then spent several intense weeks going through the
19 financial statements and trial testimony. The BHI 2007 audit included a purchase price allocation
20 of the acquired BHI assets that allocated $3,678,000 to the Chevron Jobber Agreement, which
21 Morabito now knew was fictitious because the Herbsts had never exercised the option. Morabito
22 then discovered that the Herbsts took an impairment reduction of the Chevron Jobber Agreement
23 against BHI's 2007 income in the amount of $2.33 million.

24 Now aware that any financial statement entry related to the Chevron Jobber Agreement
25 was likely fictitious, Morabito searched for any missing asset or adjustment corresponding to the
26 phantom $2.33 million impairment. Focusing on the reimbursement obligation as suggested by
27 Dwelle and Breese, Morabito reviewed the audited 2005 and 2006 financials, which document
28 consistent card-lock related sale volumes with less than a 1-2% deviation from year to year, and

concluded that the reimbursement obligation for May and June 2007 should have been approximately $2.8 million – very close to the phantom $2.3 million impairment.

Morabito then examined the financial statements for May and June 2007 prepared by the Herbsts to see if he could find an accounting of the reimbursement obligations in the approximate amount of $2.8 million or any other amount. There is nothing in the May and June 2007 statements that remotely corresponds to the expected reimbursement obligation, although there are several questionable entries relating to receivables and adjustments that total exactly $2.33 million. Morabito noticed that the receivable number went from $73,000 in May, to $976,000 in June, and then jumped to $1,768,292 in the post-closing July period. Morabito was forced to conclude that the Herbsts had (1) elected to change BHI's accounting to treat the reimbursement obligations as receivables without disclosing that change to the Debtors, (2) manipulated the financial statements to omit pre-closing reimbursement obligations from the pre-closing financial statements, and (3) created fictitious accounting entries to cover their tracks.

### B. The Fraud Claims Are Not Precluded

The Herbsts argue that the Fraud Claims are precluded even if the allegations are factually true. Opposition, p. 15. The Herbsts argue that the Fraud Claims are precluded because the State Court Action resulted in a final judgment on the merits and the Fraud Claims could have been raised prior to that final judgment.

The argument is frivolous. Every claim asserting fraud on the court or fraud pursuant to Rule 60(b)(3) is an attack on a final order, which means the existence of a final judgment is an element of the claim. It may be a substantive defense to the claim that the plaintiff should have discovered the fraud prior to entry of judgment, but the claim is not precluded by the final judgment.

### C. The Fraud Claims Are Not Barred Because Of Other Findings And Conclusions

The Herbsts argue that the Fraud Claims are not colorable even if the allegations are factually true because the State Court FF&CL included additional findings and conclusions favorable to the Herbsts. As set forth in the Motion, in alleging fraud, there is no requirement that

61278965.2                               - 6 -

the plaintiff prove that a different result would have occurred at trial in the absence of the fraud. *See, e.g., Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995) ("it is unnecessary for Lonsdorf to establish that the misrepresentation altered the outcome of the trial").

In any event, it will be for the trier of fact to determine the materiality of the fraud and the appropriate remedy. Judge Adams made quite clear that the discrepancy in the accounts payable was the key issue, and his findings and conclusions concerning Morabito's conduct, credibility and intentions at the time regarding other issues all flowed from his central finding that Morabito's calculation of the accounts payable was a baseless fiction.

### D.    The Testimony Of Third Parties Is Not Relevant

The Herbsts argue that that the Fraud Claims are not colorable because the State Court did not rely solely on the financial statements prepared by the Herbsts, but the testimony of third parties including Paula Meyer, Stanton Bernstein, and Karen Scarborough. It is true that the State Court relied on the testimony of those parties in concluding that Morabito's payable calculation was understated, but none of those individuals testified concerning the exclusion of the reimbursement obligation and there is no reason any of those three could have had any knowledge of the omission of the reimbursement obligation from the pre-closing financial statements prepared post-closing by the Herbsts.[1]

### E.    The Fraud Claims Are Timely

The Herbsts argue that the Fraud Claims are untimely because the Trustee did not file the claims prior to the extended statute of limitations provided by section 108(a) of the Bankruptcy Code. The objection is mistaken.

First, there is no statute of limitations for a claim asserting fraud on the court, so that claim is unaffected by the applicability of section 108(a).[2]

---

[1] Paula Meyer, BHI's CFO prior to the closing of the ARSPA, had significant institutional knowledge of the accounting of the reimbursement obligation (unlike Bernstein and Scarborough), but she resigned right after the closing and played no role in the preparation of the Herbst created financial statements.

[2] As set forth in the Motion, the Debtors have independent standing to bring a declaratory relief action that a fraud on the court occurred, so the issue is irrelevant to the Motion.

Second, the Trustee filed a motion to extend his time to file fraudulent transfer claims to January 24, 2017, so the fraudulent transfer claims are not currently time-barred.

With respect to the claims based upon NRCP 60(b)(2) and (3), the Debtors filed a complaint on December 16, 2016. Standing to prosecute the filed claims is governed by NRCP 17, which tracks FRCP 17.[3] Pertinently, Rule 17 provides the following with respect to a claim that is not filed by the real party in interest but then subsequently prosecuted by the real party in interest:

> No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Accordingly, if the real party in interest is substituted in after the statute of limitations expires, the complaint is deemed timely. *See generally, Mutuelles Unies v. Kroll & Linstrom*, 957 F.2d 707, 712 (9th Cir. 1992). This doctrine applies where a party other than the bankruptcy trustee files a complaint and the trustee is subsequently substituted in as the real party in interest. *See, e.g., Arab Monetary Fund v. Hashim (In re Hashim)*, 379 B.R. 912 (B.A.P. 9th Cir. 2007); *Killmeyer v. Oglebay Norton Co.*, 817 F. Supp. 2d 681 (W.D. Pa. 2011); *Rousseau v. Diemer*, 24 F. Supp. 2d 137 (D. Mass. 1998).

Pursuant to the Motion, the Debtors request authorization to serve as the "real property in interest" with respect to the Fraud Claims. If the Court grants the Motion, the complaint will be deemed timely filed.

### F. The Herbsts Do Not Dispute The Allegations Of The Fraud Claims

The allegation of fraud is very specific. As of the closing date of the ARSPA, WE owed BHI several million dollars related to the sale of fuel from WE card locks located at BHI convenience stores. That reimbursement obligation had to be included in the balance sheet as of the closing as either a receivable or a credit against a payable owed to WE. Either recording

---

[3] The Herbsts filed a notice of removal, and the action has yet been remanded, so standing may ultimately be governed by FRBP 7017 and not NRCP 17, but the statutes are effectively identical.

61278965.2                                  - 8 -

would have had the same effect for purpose of the working capital calculation. The Debtors argue that the Herbsts fraudulently omitted that several million dollar asset from the financial statements, which created a material gap in the working capital calculation that Morabito could never explain and led the State Court to conclude that Morabito's working capital estimate was a baseless fiction.

As the allegation is very specific, it is very easy to disprove. All that the Herbsts have to do is produce a pre-closing BHI financial statement that they prepared and delivered to the Debtors and the Independent Accountants during the State Court Action and point to the line item that included the correct pre-closing accounting and crediting of the entire May and June reimbursement obligation (estimated to be approximately $2.8 million). If they can show that entry, there is no fraud claim. It is that simple.

The Herbsts submitted a 19 page opposition to the Motion, supported by two declarations and over 125 pages of exhibits. The Motion repeats *ad nauseam* the procedural history of the ARSPA, the State Court Action, the State Court's FF&CL, the Settlement Agreement, the Confession of Judgment, the Forbearance Agreement, the Involuntary Petition, and the nondischargeability proceeding. ***But not one word denying the fraud alleged by the Debtors***.

Instead of denying the Debtors' allegations, the Herbsts engage in a sleight of hand. They allege that the Debtors now allege that the Herbsts "fraudulently included assets and liabilities of Nella Oil/Western Energetix on BHI's financial statements and their working capital estimate." Opposition, p. 12, lines 1-3. To refute the allegation, the Herbsts submit evidence that whether or not WE liabilities were incorrectly included in the financial statements was "fully explored and investigated" in the State Court Action. Opposition, pp. 4-5. Based upon that evidence, the Herbsts argue that the fraud claims are frivolous.

The argument is sleight of hand and deceptive, because the Herbsts are intentionally playing on this Court's ignorance of the State Court Action to conflate two entirely separate issues. It is critical for this Court to understand that WE interacted with BHI in two entirely distinct roles: (1) the purchaser of BHI's non-convenience store assets in January 2007, and (2) the ongoing operational role as the largest supplier of fuel to the BHI convenience stores.

With respect to its role as purchaser of assets in January 2007, for reasons beyond the scope of this Motion, certain Chevron Terminal and dealer account assets purchased and liabilities assumed by WE remained on BHI's financial statements for several months.[4] During the State Court Action, considerable time was expended attempting to disentangle those assets and liabilities from BHI's actual assets and liabilities for purposes of the working capital calculation. This was the issue "fully explored and investigated" during the State Court Action. To make it absolutely clear for this Court, contrary to the Herbsts' deceptive argument, ***the Fraud Claims asserted now have absolutely nothing to do with WE's role as purchaser of BHI's wholesale assets in January 2007, the Debtors' temporary post-closing involvement with the Chevron Terminal and related dealer account assets, and the corresponding entanglement in the BHI financial statements***.

The fraud is entirely related to the second operational role, which was as the supplier of fuel to the convenience stores in the regular course of business for both the pre-closing and post-closing periods. Every month BHI would purchase several million dollars of fuel from WE for the convenience stores, which created BHI's largest monthly payable. As a result of WE's purchase of the card-lock related assets in January 2007, some of that purchased fuel then went to WE's card-lock customers instead of BHI's customers. This created the reimbursement obligation, which reduced the monthly payable to WE. That reimbursement obligation was never "fully explored and investigated," let alone explored or investigated at all, during the State Court Action, because it never occurred to Morabito it was even conceivably an issue.

To repeat, the fraud now alleged is very easy to refute. The fact that the Herbsts have not addressed, let alone refuted, the allegation, and instead falsely characterized the allegation, is the best evidence this Court now has that the Fraud Claims are colorable.

---

[4] Among the assets sold to WE in January 2007 were rights and contracts relating to the distribution of Chevron fuel. Because WE was not fully licensed to operate all of the Chevron assets, the Debtors agreed to operate those assets using BHI's licenses until WE was fully licensed in late June 2007. Consequently, all of WE's Chevron distribution transactions flowed through BHI's books and records for several months after the January 2007 closing.

61278965.2                              - 10 -

## III.

## THE CLAIMS MUST BE ABANDONED IF THE DEBTORS ARE NOT AUTHORIZED TO PROSECUTE ON BEHALF OF THE ESTATE

As the Fraud Claims have now been identified, they must be administered by the Trustee, which means either prosecution to judgment, settlement or abandonment. The Trustee expressly states that he will not prosecute the Fraud Claims even if colorable. The Debtors, at no cost to the estates, are willing to prosecute the Fraud Claims on behalf of the estates.

If the Court were to conclude that the Debtors should not be permitted to prosecute the Fraud Claims on behalf of the estates, the Fraud Claims will not disappear and go away. They must be still be administered, which means abandonment pursuant to section 554 of the Bankruptcy Code. Since the claims will have to be abandoned in any event, they should be abandoned now so that the Debtors and the Debtors' other creditors can prosecute the claims at this time.

## IV.

## CONCLUSION

At the hearing in August 2016 in the nondischargeability proceeding, this Court inquired "was any challenge made to that confession of judgment in the state court?" The answer at the time was no, because as of that hearing there was no legal or factual basis to challenge the enforceability of the confession of judgment in state court. By happenstance, the Debtors are now aware of a very compelling basis to challenge the confession of judgment in the State Court. The determination of whether or not the Herbsts committed a fraud in connection with the State Court Action should be determined by the State Court after consideration of all facts, and not by this Court on a motion for authority to prosecute claims on behalf of the estate. As the Trustee represents that he will not bring the claims even if meritorious, there is no reason to preclude the Debtors, at no cost to the estates, to prosecute the claims on behalf of the estates.

DATED: January 18, 2017

ROBISON, BELAUSTEGUI, SHARP & LOW
71 Washington Street
Reno, Nevada 89503
Telephone: (775) 329-3151

and

ROBINS KAPLAN LLP
2049 Century Park East, Suite 3400
Los Angeles, CA 90067
Telephone: (310) 55200130

By: /s/ Frank C. Gilmore
    Kent R. Robison, Esq. (SBN 1167)
    Frank C. Gilmore, Esq. (SBN 10052)
    David B. Shemano, Esq. (admitted *pro hac vice*)

Attorneys for Consolidated Nevada Corporation

||
|---|
| 1 |
| 2 |
| 3 |
| 4 |
| 5 |
| 6 |
| 7 |
| 8 |
| 9 |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |
| 26 |
| 27 |
| 28 |

## CERTIFICATE OF SERVICE

Pursuant to FRBP 7005 and FRCP 5(b), I certify that I am an employee of ROBISON, BELAUSTEGUI, SHARP & LOW, that I am over the age of 18 and not a party to the above-referenced case, and that on the date below I caused to be served a true copy of the **REPLY IN SUPPORT OF MOTION FOR AUTHORITY TO FILE AND PROSECUTE CLAIMS ON BEHALF OF BANKRUPTCY ESTATE OR, IN THE ALTERNATIVE, TO COMPEL ABANDONMENT OF CLAIMS** on all parties to this action by the method(s) indicated below:

__X__    I hereby certify that on the date below, I electronically filed the foregoing with the Clerk of the Court by using the ECF system which served the following parties electronically:

Gabrielle A. Hamm
bknotices@gordonsilver.com;
bankruptcynotices@gordonsilver.com
Brian R. Irvine
birvine@gordonsilver.com,
sglantz@gordonsilver.com

*Attorney for* Creditor Berry-Hinckley Industries, Creditor JH, Inc., Creditor Jerry Herbst

Gerald M. Gordon
ggordon@gtg.legal
Teresa M. Pilatowicz
tpilatowicz@gtg.legal
Mark M. Weisenmiller
mweisenmiller@gtg.legal

*Attorney for* Creditor Berry-Hinckley Industries, Creditor JH, Inc., Creditor Jerry Herbst

Jeffrey L. Hartman
notices@bankrutpcyreno.com,
sji@bankruptcy.com

**U.S. TRUSTEE - RN – 11**
USTPRegion17.RE.ECF@usdoj.gov
*U.S. Trustee*

_____    by placing an original or true copy thereof in a sealed envelope, with sufficient postage affixed thereto, in the United States mail at Reno, Nevada, addressed to:


DATED:  This 18th day of January, 2017.

/s/ Mary Carroll Davis

Robison, Belaustegui,
Sharp & Low
71 Washington St.
Reno, NV 89503
(775) 329-3151