

Honorable Gregg W. Zive
United States Bankruptcy Judge

Entered on Docket
June 23, 2017

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: BK-S-13-51236-GWZ<br>Chapter: 7 |
| CONSOLIDATED NEVADA CORPORATION, | |
| Debtor. | Hearing:<br>Date: February 8, 2017<br>Time: 2:00 p.m. |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ORDER DENYING MOTION FOR AUTHORITY TO FILE AND PROSECUTE CLAIMS ON BEHALF OF BANKRUPTCY ESTATE OR, IN THE ALTERNATIVE, TO COMPEL ABANDONMENT OF CLAIMS

The Court has reviewed the findings of fact and conclusions of law proposed pursuant to Local Rule 9021 from counsel for JH, Inc. ("JH"), Jerry Herbst ("Herbst"), and Berry-Hinckley Industries ("BHI," and together, the "Herbst Parties"), the opposition to the Herbst Parties' proposed findings and conclusions [ECF No. 142] filed by counsel for Paul A. Morabito ("Morabito") and Consolidated Nevada Corporation ("CNC," and together with Morabito, the "Debtors"), the response filed by the Herbst Parties [ECF No. 144], has considered and undertaken a thorough review of the transcript of the February 8, 2017, at 2:00 p.m. hearing (the "Hearing") and the pleadings and papers filed with respect to the *Motion for Authority to File and Prosecute Claims on Behalf of Bankruptcy Estate or, in the Alternative, to Compel Abandonment of Claims* [ECF No. 131] (the "Motion").

The following are the Court's findings of fact and conclusions of law, entered in

accordance with FRCP[1] 52, applicable in the Chapter 7 Cases pursuant to Bankruptcy Rule 9014, following the Court's review and consideration of all other relevant pleadings and papers [ECF Nos. 131-32, 136-40, and 148-49], argument, and the transcript of the Hearing:

**IT IS HEREBY FOUND AND DETERMINED** by the Court as follows:

1.      The Court has jurisdiction of the matters raised in the Motion as core proceedings pursuant to 28 U.S.C. §§ 157 and 1334.

2.      Determining whether to grant the Motion is a core proceeding in which the Court may enter a final judgment in accordance with 28 U.S.C. § 157(b)(1) and (b)(2)(A), (C), (H), (M), and (O).

3.      Venue of the Chapter 7 Case in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      Good, sufficient, and timely notice of the Motion and Hearing has been given to those to whom notice is required to be given in accordance with the United States Constitution, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Notice of all proceedings regarding or relating to the Motion and Hearing was adequate under the circumstances and materially complied with applicable provisions of the United States Constitution, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

## FINDINGS OF FACT

**A.      The Dispute, the Trial, and the State Court Judgment.**

5.      JH and P.A. MORABITO & CO. Ltd. ("PAMCO"), the predecessor-in-interest to CNC, entered into an *Amended and Restated Stock Purchase Agreement* dated June 28, 2007 (the "ARSPA"), whereby JH was to purchase the stock of BHI from PAMCO.  Herbst was the guarantor of the JH obligations under the ARSPA, and Morabito guaranteed the obligations of PAMCO.

---

[1] All references to "Chapter" or "Section" herein shall be to the Bankruptcy Code appearing in Title 11 of the U.S. Code; all references to a "Bankruptcy Rule" shall refer to the Federal Rules of Bankruptcy Procedure; all references to "FRCP" shall refer to the Federal Rules of Civil Procedure; and all references to "Local Rule" are to the Local Rules of Bankruptcy Practice for the U.S. District Court for the District of Nevada.

2

6.      A dispute developed between Debtors and the Herbst Parties regarding the sale of the BHI stock to JH.  Debtors filed a lawsuit against the Herbst Parties on December 3, 2007, captioned *Consolidated Nevada Corp., et al. v. JH. et al*., in Department 6 of the Second Judicial District Court in and for the County of Washoe (the "State Court"), Case No. CV07-02764 (together with all claims and counterclaims, the "State Court Action").  The Herbst Parties filed numerous counterclaims in the State Court Action against Debtors, including, but not limited to, fraud in the inducement, misrepresentation, and breach of contract.

7.      On April 17, 2009, Debtors' counsel in the State Court Action, Leif Reid, transmitted a letter to the Independent Accountant (the "IA") appointed by the State Court, requesting that the IA verify that all BHI liabilities were properly included in the Herbst Parties' working capital report as of July 2, 2007, with respect to Nella Oil/Western Energetix ("WE") (the "April 17 Letter").

8.      The April 17 Letter requested that the IA speak with the owner of WE, Walter Dwelle, and provided that Mr. Dwelle would provide an affidavit supporting Debtors' claim regarding the liabilities.

9.      The IA asked that Debtors provide him with the specific accounts, vendors, transactions or any other detail relating to Debtors' allegations that certain of BHI's reported liabilities were the financial obligation of an entity other than BHI so that the IA could consider and investigate Debtors' claims through the review process.

10.     On April 21, 2009, the IA spoke with Mr. Dwelle by telephone regarding Debtors' allegations in the April 17 Letter.  However, Mr. Dwelle suggested that no WE liabilities or other transactions should be in the BHI financials as of July 2007 because the sale closed in January 2007 and any commingling of the companies' activities would have ceased well before July 2007.

11.     On April 23, 2009, Shepard Mullin, counsel to the IA, responded to the April 17 Letter, addressing each point raised in the April 17 Letter, including the assertions regarding WE (the "April 23 Response").

12.     Debtors often promised to provide an affidavit or other testimony from Mr. Dwelle to support their allegations, but never did.

3

13.     On June 18, 2009, the IA submitted to the State Court the final working capital report and, on August 12, 2009, the State Court entered a working capital order (the "Working Capital Order") approving and adopting the working capital report in its entirety.

14.     On August 19, 2009, the Debtors appealed the Working Capital Order to the Nevada Supreme Court.  On November 17, 2011, the appeal was dismissed.

15.     On or about March 26, 2010, Jones Vargas, counsel for the Herbst Parties, filed with the State Court the *[Second] Amended Expert Report of Craig l. Greene, CPA/CFF, CFE, MCJ* (the "Expert Report").

16.     The Court reviewed and considered the Expert Report.  (Hearing Trans. pp. 100:19-1:104).  One excerpt of the Expert Report (pages 20 and 21) further substantiates that the WE transaction with BHI was fully explored and investigated.  A second excerpt from the Expert Report (pages 81 and 82) illustrates that the WE transaction actually harmed BHI because of the losses inherent in the undisclosed agreement regarding the cost of fuel.  Finally, another excerpt from the Expert Report (Exhibit 16) evidences the third component of damages, $66,002,205.75, awarded by the State Court in the Judgment as more particularly described below in Paragraphs 18-20.

17.     The State Court Action was tried before the Honorable Judge Brent Adams by way of a bench trial commencing May 10, 2010 and lasted several weeks.

18.     On October 12, 2010, the State Court entered findings of fact and conclusions of law (the "FF&CL") in the State Court Action, which specifically set forth the legal and factual basis for judgment against Morabito for fraud in the inducement.  The State Court found that there was not sufficient evidence to warrant a finding of fraud or to award damages with respect to the representations of value of BHI.  However, the State Court found that Morabito falsely represented that he intended to perform the services of construction manager, that he made those representations to induce the Herbst Parties to purchase certain development sites, the Herbst Parties relied upon those representations, and the Herbst Parties were damaged in the amount of $19,869,159.  The State Court also concluded that the working capital estimate prepared by Morabito prior to the closing included false representations regarding the amount of accounts

4

payable and the Herbst Parties would not have purchased BHI if they were aware of the false representations in the working capital estimate, and the Herbst Parties were damaged in the additional amount of $66,002,205.75.

19.    As to the Herbst Parties' fraud allegations with respect to Morabito's representations regarding construction management services in the *Construction Management Agreement* (the "CMA"), the State Court concluded that in the FF&CL:

**2. Fraud in the Inducement**

69. The Court finds by clear and convincing evidence that Mr. Morabito never for a single second had any intention to perform the services of construction manager.

70. Mr. Morabito's representations under the CMA were intentionally false.
…
73. As a result, [the Herbst Parties] have been damaged in the sum of $19,869,159.

20.    With respect to the Herbst Parties' losses due to Morabito's fraud as a result purchasing BHI, including consideration of BHI's monthly losses, accounts payable, and the working capital estimate, the State Court concluded in the FF&CL:

34. Clear and convincing evidence shows that there was no basis whatsoever for the contents of the working capital estimate other than Mr. Morabito's decision to create it.

35. There is not one piece of paper that has been produced in over 5,500 exhibits in this trial, to the Independent Accountants, during discovery or anywhere else, to support the exaggerated value of the company as set forth in the working capital estimate.

36. The major difference between Mr. Morabito's estimate and the actual working capital is accounts payable. This fact is significant.

37. The Court is very impressed with the testimony of Paula Meyer. Ms. Meyer worked for BHI since approximately 1995. She worked for years under the direction of Mr. Hinckley, who impressed the Court as an honest and fine business person.  Ms. Meyer is also a CPA and was the CFO of BHI. Ms. Meyer graduated from the University of Nevada, Reno and was an accountant at Grant, Thornton.
…
43. In the course of events leading to the closing of this transaction, there was a point where Mr. Morabito wanted Ms. Meyer to communicate only with him and not the lawyers or BCC. This is a small fact, but it is an unusual fact. This is a complex transaction involving tens of millions of dollars. As the CFO, Ms. Meyer had access to the financial statements of the company while the CEO of the

5

company, Mr. Morabito, did not have such access. Nevertheless, Mr. Morabito instructed Ms. Meyer to only communicate with him. Thus, the buyer was deprived of access to Ms. Meyer (who knew the true financial condition of the company) and had to rely exclusively on the false working capital estimate prepared by Mr. Morabito.

44. Ms. Meyer testified that she did not know what happened to information once it went to Mr. Morabito. Mr. Morabito handled the majority of the information.

45. Ms. Meyer's testimony regarding her constant disputes and disagreements with Paul Morabito about the accounts payable was very moving.

46. It is not enough to say Ms. Meyer constantly had disagreements with Mr. Morabito about the amount of accounts payable. Ms. Meyer's anxiety and fear of this man because of his relentless, torturous attacks on her to drive down the accounts payable was almost palpable as she testified. Her testimony sounded more like the accounts the Court hears in cases of spousal abuse than in cases of commercial transactions.

47. Ms. Meyer was then shown the document prepared by Mr. Morabito and she knew in the flicker of an eye that it was way off.

48. Ms. Meyer testified that monthly accounts payable should have been in the range of at least five to six million. Ms. Meyer had no idea why Mr. Morabito made the representation he did.

49. Mr. Morabito always thought accounts payable should be lower. It was always a battle back and forth between Mr. Morabito and Ms. Meyer.

50. Mr. Stanton Bernstein, Mr. Morabito's personal accountant, agreed with Ms. Meyer regarding accounts payable.

51. Ms. Karen Scarborough, the BHI controller, also agreed with Ms. Meyer.

53. On or about March 8, 2007, the accounts payable totaled $7,405,342.33.
…
55. Ms. Meyer told Mr. Morabito on the telephone many times that she knew the payables were way too low.
…
59. The working capital estimate Mr. Morabito gave the buyer had no basis in reality. It was contrary to what he knew firsthand to be the truth.
…
93. Clear and convincing evidence shows that there was no basis whatsoever for the contents of the working capital estimate other than Mr. Morabito's decision to create it. [The Herbst Parties] proved, by clear and convincing evidence, that Mr. Morabito's statements of working capital were false and known by him to be false, that [the Herbst Parties] reasonably relied on Mr. Morabito's statements of working capital, and were damaged thereby.

6

94. Generally speaking, an estimate of value cannot be the basis for a legal claim for fraud or other misconduct. However, the circumstances in this case are different.

    a.    First, the estimate was prepared by Mr. Morabito, the owner of the company.

    b.    Second, the estimate was significantly and materially inconsistent with the information he was given firsthand by his chief financial officer and by his personal accountant.

    c.    Third, there is no evidence that anyone else reviewed the estimate that was prepared by Mr. Morabito.

95. There is simply no other conclusion available than the working capital report that was prepared by Mr. Morabito was intentionally false, was done for the purpose of [the Herbst Parties] relying on it, and that [the Herbst Parties] did reasonably rely on it.

96. There is no data in the company to support the working capital estimate.

97. Mr. Morabito knew firsthand from his own employees and from his own accountant that it was incorrect.

98. The working capital estimate was materially inflated and falsely inflated the value of the company, and that became apparent shortly after close of the transaction.

…

103. In December of 2006, [the Herbst Parties] were told BHI was losing about $600,000 a year. [Debtors'] own analysis indicated the company was losing approximately $1.5 million a year. In relatively short order, it turns out the company was losing approximately $1 million a month. Thus, it is reasonable, as Mr. Greene suggested, to extrapolate from performance to the truthfulness or untruthfulness of the representations concerning the value of BHI.

104. This evidence is not sufficient to warrant a finding of fraud or to award damages with respect to the representations of the value of BHI.

105. However, these facts demonstrate that had Defendants known the truth about the working capital, they would not have bought the company.

106. The Court, having found that defendants were fraudulently induced, awards damages to [the Herbst Parties] and against [the Morabito Parties] in the amount of $66,002,205.75.

    21.    Based upon the FF&CL, the State Court awarded total compensatory damages to the Herbst Parties in the amount of $85,871,364.75 for fraud in the inducement.

7

22. After discovery regarding punitive damages, the State Court entered a judgment awarding the Herbst Parties total damages in the amount of $149,444,777.80, representing both compensatory and punitive damages (the "State Court Judgment") on August 23, 2011.

23. After entry of the State Court Judgment, Debtors filed numerous appeals with the Nevada Supreme Court, denominated as Supreme Court Case Nos. 57943, 57944, 59138, and 54412. The Herbst Parties also filed numerous cross-appeals (together with the appeals filed by Morabito, the "Appeals").

**B.    Settlement Agreement, Default, and Confessed Judgment.**

24. The Herbst Parties and Debtors, with the advice of counsel, agreed to settle the State Court Action and the Appeals and, on November 30, 2011, executed the *Settlement Agreement and Mutual Release* (the "Settlement Agreement").

25. Pursuant to the Settlement Agreement and subsequent to its execution, the Appeals were vacated, as were the State Court Judgment and the FF&CL.

26. As part of the Settlement Agreement, Morabito agreed to (i) make several cash payments to the Herbst Parties, (ii) assume certain obligations of the Herbst Parties, (iii) indemnify, defend, and hold harmless the Herbst Parties for certain claims in certain actions, and (iv) list for sale certain real property for the benefit of the Herbst Parties, all of which totaled an obligation of approximately $20 million.

27. As part of the Settlement Agreement, Morabito also agreed to execute a confession of judgment for $85,000,000 (the "Confession of Judgment") which included a recitation of the findings of facts and conclusions of law from the FF&CL that were subsequently vacated by stipulation.

28. Debtors defaulted under the terms of the Settlement Agreement as a result of their failure to timely comply with the terms of the Settlement Agreement, including their failure to pay to the Herbst Parties the cash payment of $4,000,000 due on or before March 1, 2013 (the "Continuing Defaults").

29.     Morabito thereafter requested that the Herbst Parties forbear from exercising their rights and remedies under the Settlement Agreement with respect to the Continuing Defaults until December 1, 2013.

30.     Accordingly, Debtors and the Herbst Parties, with the advice of counsel, entered into that certain Forbearance Agreement dated March 1, 2013 (the "Forbearance Agreement").

31.     As a result of Debtors' breach of the Settlement Agreement and Forbearance Agreement, the Herbst Parties filed with the Clerk of the State Court the Confession of Judgment and the Stipulation of Nondischargeability on June 18, 2013 (the "Confessed Judgment Action").

32.     The Confessed Judgment was entered onto the judgment roll by the Clerk of the State Court.

33.     Morabito argued that the entry of the Confessed Judgment was procedurally improper because the State Court Action was closed, so the Herbst Parties were required to obtain a new case number in order for the Confessed Judgment to be entered onto the judgment roll. The State Court in the Confessed Judgment Action held that the filing of the Confessed Judgment was proper and in compliance with the applicable Nevada Revised Statutes.

34.     Morabito also petitioned for a writ of mandamus, which was denied by the Nevada Supreme Court.

**C.      The Involuntary Proceedings.**

35.     On June 20, 2013 (the "Petition Date"), the Herbst Parties filed involuntary petitions for relief under Chapter 7 of the Bankruptcy Code (the "Involuntary Petitions") against Debtors, thereby commencing the Chapter 7 involuntary cases (the "Chapter 7 Cases").

36.     On December 22, 2014, the Court entered its *Amended Order for Relief Under Chapter 7*.

**D.      Debtors' Schedules, Statements, and 341 Meetings.**

37.     Debtors did not list the alleged Claims (defined below) in their schedules or statements, which were amended several times, and did not provide any information to the Chapter 7 trustee (the "Trustee") at Morabito's 341 meetings, including the continued 341 meeting conducted on December 5, 2016, just ten-days prior to the filing of the Complaint (defined below).

9

38.     However, Morabito knew of the basis of the Claims, but even though asked at the continued 341 meeting, did not disclose any of those facts to the Trustee.

**E.     The Nondischargeability Action.**

39.     On March 20, 2015, the Herbst Parties commenced an adversary proceeding (the "Adversary Proceeding") by timely filing their complaint objecting to Morabito's discharge pursuant to Sections 523(a)(2)(A) and 523(a)(2)(B) and 28 U.S.C. § 2201 [ECF No. 1 in 15-05019-GWZ] (as amended by ECF No. 8 in 15-05019-GWZ, the "Nondischarge Complaint").

40.     The Herbst Parties were awarded partial summary adjudication based upon issue and claim preclusion as a result of the Confessed Judgment on September 22, 2016. See ECF Nos. 59-60 in 15-05019-GWZ.   Morabito filed a motion for revision of the interlocutory partial summary adjudication order [ECF No. 66 in 15-05019-GWZ], which is currently under consideration by the Bankruptcy Court.

**F.     The Complaint and Motion.**

41.     On December 16, 2016, Debtors filed the Complaint, which was filed before the State Court, and removed to this Court by the Herbst Parties on December 23, 2016 [ECF No. 733 in 13-51236-GWZ] (the "Complaint").   The Debtors have filed a motion to remand the Complaint back to the State Court [ECF No. 7 in 16-50043-GWZ].

42.     The Complaint appears to seek to attack, set aside, and vitiate a judgment that no longer exists, among other assertions.   The State Court Judgment was vacated.

43.     In the Complaint, Debtors aver causes of action against the Herbst Parties for: (1) Fraud on the Court; (2) NRCP 60(b)(3) – Fraud; (3) Fraudulent Inducement; and (4) Fraudulent Misrepresentation, and seek a declaratory judgment that the Confessed Judgment is unenforceable because it is based upon the State Court Judgment, which was obtained by the Herbst Parties' fraud (collectively, the "Claims").   The Court has reviewed and studied the Complaint.

44.     Debtors allege that the Herbst Parties defrauded the Debtors, the IA, and the State Court because they omitted several million dollars of receivables owed by WE to BHI from the applicable financial statements and working capital calculation prepared by the Herbst Parties that were relied upon by the Debtors, the IA, and the State Court during the State Court Action.

10

45.     For purposes of the Motion, the Court assumes as true that (1) the Herbst Parties omitted several millions of dollars of receivables owed by WE from the applicable financial statements and working capital calculation submitted during the State Court Action, and (2) Morabito did not become actually aware of the omission until late 2016 as factual allegations in the Complaint.  But the Court must also consider the Morabito Declaration and other pleadings filed in support of the pending Motion in arriving at a determination regarding the existence of a colorable claim, including benefit to the estate, premised upon those alleged facts.

46.     The sale of the predecessor of WE appeared to be a subject that was discussed during the State Court Action to make sure that BHI's financials did not contain financial information that should not be there because of the WE sale transaction as opposed to how the ongoing business relationship between WE and BHI should have been calculated; in other words, for reimbursement or setoff purposes, which had nothing to do with the sales transaction itself. They are two separate things.

47.     It is evident that Debtors' counsel was extraordinarily thorough and diligent.  The April 17 Letter is very detailed.  In the April 23 Response from the IA, the IA asked Debtors to identify any other witnesses and to produce all other documents relevant to their claim that the accounts payable for BHI included the accounts payable of other entities as well as the relevant contact information for those entities.  In sum, the IA wanted to make sure that it was only BHI's obligations and assets were listed on its financial statements.

48.     The IA also agreed that the State Court order which appointed him obligated him to undertake a reasonable factual investigation and requested that the parties promptly provide him any other specific suggestions about what and whom he should investigate.

49.     The IA also suggested that the parties would have ample opportunity to respond to and challenge his recommendations.

50.     In fact, Debtors challenged the IA's report, appealed the Court's acceptance of the report, and ultimately dismissed the appeal of the working capital determination.

51.     To think that Debtors would overlook the issues raised in the Complaint during the State Court Action is very difficult for the Court to accept.  Not only was there extensive discovery

11

and a trial, there were appeals, cross appeals, settlement negotiations, the execution of the Settlement Agreement by Debtors, the execution of the Confession of Judgment by Debtors, the negotiation and execution of the Forbearance Agreement, the entry of the Confession of Judgment on the State Court judgment roll, Debtors' petition for a writ of mandamus to the Nevada Supreme Court, and the contentious involuntary bankruptcy proceedings.  The Debtors' conduct in the litigation both in the State Court and in the Bankruptcy Court demonstrates a pattern of meticulous attention regarding all issues because of the critical importance those issues have upon the Debtors. Nothing prevented the Debtors from conducting the asserted investigation for years prior to late 2016.

52.    Morabito stated in the Morabito Declaration that he could not understand the discrepancy that he asserts he found in late 2016.  Yet, his counsel wrote a very detailed April 17, 2009 Letter to the IA and the IA responded on April 23 Response asking for any additional information on the subject.

53.    It is not credible that Morabito and his counsel in the State Court Action did not scrutinize all the facts and issues at that time, speak with Mr. Dwelle, or provide an affidavit or declaration at that time.  While the Debtors' counsel offered to provide a declaration or affidavit from Mr. Dwelle, no declaration or affidavit was ever provided.

54.    The amended Motion was filed on December 28, 2016.

55.    The Motion requests that the Court authorize Debtors and their counsel to prosecute the Complaint or force the Trustee to abandon the Claims against the Herbst Parties so the Debtors can prosecute the Complaint.  In the Motion, the Debtors admit that the causes of action set forth in the Complaint are property of the Debtors' estates.

56.    Prior to filing the Complaint, Debtors did not provide any information to the Trustee regarding the Claims and did not make a request or demand upon the Trustee to prosecute the Claims, nor seek approval from the Court to prosecute the Claims or have them abandoned.

57.    Debtors contend they had to file the Complaint on December 16, 2016, to preserve the estate's rights (not theirs) against the Herbst Parties.

12

# CONCLUSIONS OF LAW

### A.    Debtors' Request for Derivative Standing.

58.    A trustee, including the debtor-in-possession, is both authorized and has the duty to manage the property of the bankruptcy estate.  See Louisiana World Exposition v. Fed. Ins. Co., 858 F.2d 233, 245 (5th Cir. 1988).  This includes collecting the property of the bankruptcy estate to maximize its value.  See id. at 246.  The trustee is dutybound to assert claims or causes of action on behalf of the bankruptcy estate if doing so will maximize the estate's value.  See id.

59.    It is an exception to the general rule when a court allows anyone other than a trustee or debtor-in-possession to bring an action that the trustee has the responsibility, and perhaps the exclusive right, to bring.  As such, the burden is upon the party seeking to establish the right to bring the action.

60.    "It is well settled that in appropriate situations the bankruptcy court may allow a party other than the trustee or debtor-in-possession to pursue the estate's litigation."  See In re Spaulding Composites Co., Inc., 207 B.R. 899, 903 (9th Cir. B.A.P. 1997) (citing Louisiana World, 858 F.2d at 247–52 n. 19 (and cases cited therein)); see also In re Catwil Corp., 175 B.R. 362, 364 (Bankr. E.D. Cal. 1994) ("Although the Code does not contain a parallel section that authorized a creditors' committee to initiate adversary proceedings, courts have held that sections 1103(c)(5) and 1109(b) imply such a right.").

61.    A majority of the federal circuit courts have held that derivative standing is available in bankruptcy proceedings.  The circuit courts have generally required that the court must expressly authorize standing, and may do so only where the trustee or debtor-in-possession is found to be unwilling or unable to assert the claims or causes of action on behalf of the estate, and granting derivative standing to pursue the claims is likely to benefit the estate.

62.    Courts such as the Sixth Circuit in Canadian Pacific have recognized a test loosely comprised of four prongs, providing that a party may have derivative standing to initiate actions beneficial to the estate where: (1) a demand made upon trustee or debtor-in-possession to act; (2) the demand is declined; (3) the claim is colorable and would benefit the estate based on a cost-

13

benefit analysis; and (4) inaction is an abuse of discretion.  See In Canadian Pacific Forest Products, Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.) 66 F.3d 1436, 1438-46 (6th Cir. 1995).

63.    While other courts have undertaken distinct analyses, nominally identifying different factors, the analyses consistently revolve around whether the trustee or debtor-in-possession has unjustifiably refused to pursue a colorable claim that would benefit the estate.  See, e.g., Unsecured Creditors Committee of Debtor STN Enterprises v. Noyes (In re STN Enterprises), 779 F.2d 901 (2nd Cir. 1985) (court may approve committee's right to initiate suit where unjustifiable failure to bring colorable avoidance action likely to benefit estate); In in re McKeesport Steel Casting Co., 799 F.2d 91, 94 (3rd Cir. 1986); Louisiana World, 858 F.2d at 247, 252 (standing may be granted where (1) claim at issue colorable, (2) debtor-in-possession or trustee has unjustifiably refused to pursue, and (3) committee pursues court approval); In In re Perkins, 902 F.2d 1254, 1258 (7th Cir. 1990) (derivative standing is appropriate when three elements are met: (1) the trustee unjustifiably refuses a demand to pursue the action, (2) the creditor establishes a colorable claim or cause of action, and (3) the creditor seeks and obtains leave from the bankruptcy court to prosecute the action for and in the name of the trustee).

64.    Within the Ninth Circuit, the Sixth Circuit's Canadian Pacific four-prong test was expressly acknowledged by the Montana Bankruptcy Court in Yellowstone, which found that, in determining whether to confer derivative standing, courts often consider whether: (1) a demand had been made upon the statutorily authorized party to take action; (2) the demand is declined; (3) a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court; and (4) the inaction is an abuse of discretion in light of the debtor-in-possession's duties in a Chapter 11 case.  See In re Yellowstone Mountain Club, LLC, No. 08-61570-11, 2009 WL 982207, at *2 (Bankr. D. Mont. Jan. 16, 2009) (citing In re Valley Park, 217 B.R. 864, 866 (Bankr. D. Mont. 1998) and Canadian Pacific, 66 F.3d at 1436).  See also In re Alaska Fur Gallery, Inc., No. A09-00196-DMD, 2010 WL 7765571, at *1 (Bankr. D. Alaska May 21, 2010) (adopting Canadian Pacific analysis).

65.    The Court concludes that the bankruptcy court identified the correct standard in Yellowstone.

14

4827-5204-3849, v. 2

66.     Here, prior to filing the Complaint, Debtors provided no information to the Trustee with respect to the Claims and made no request or demand upon the Trustee to prosecute the Claims.  Thus, the first and second requirements for derivative standing were not satisfied.

67.     However, a demand would have been futile, but not because the Herbst Parties voted for the Trustee and selected the Trustee.  No party sought to replace the Trustee.  No party has even raised any allegation that the Trustee has done anything inappropriate.  That by itself would not have been a sufficient basis to find futility.

68.     A demand would have been futile because the Trustee represents that he does not have an unlimited budget and, in fact, estate funds are limited.

69.     Yet, even if a demand was made, it would not have been an abuse of discretion for the Trustee to decline to prosecute the Claims.  According to the Trustee, he has determined that the Claims are not colorable based upon his review of the Complaint, the pleadings in the State Court Action, and the Herbst Parties' opposition to the Motion.  The Court finds that the Trustee has made a credible case why he would not have brought the Claims, even if he had the financial ability to prosecute the Complaint.

70.     Because the Trustee has acknowledged that he cannot prosecute the Claims, it is not relevant that no demand was made and the Trustee did not consent.

71.     The Court must make an independent determination as to whether any of the Claims are colorable.  The Court can consider the Trustee's colorable analysis as a factor in the Court's independent determination.

72.     In conjunction with the Court's independent analysis of whether the Claims are colorable, the Court must make the determination of whether the Claims are plausible.  Undertaking that analysis requires that the Court rely upon the standard for FRCP 12 as provided in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) and Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

73.     "Fraud upon the court consists of, *inter alia*, 'such conduct as prevents a real trial upon the issues involved.'"  Murphy v. Murphy, 103 Nev. 185, 186 (Nev. 1987).

74.     The elements of a claim for relief pursuant to FRCP 60(b)(2) are: (1) that the evidence existed at the time of trial; (2) that it could not have been discovered through due diligence; and (3) it is of such magnitude that production of it earlier would have been likely to change the disposition of the case.  See Jones v. Aero/Chem Corp., 921 F.2d 875, 878 (9th Cir. 1990). See also Nelson v. Heer, 121 Nev. 832, 833, 122 P.3d 1252, 1253 (2005), *as modified* (Jan. 25, 2006) (recognizing that "federal decisions involving the Federal Rules of Civil Procedure provide persuasive authority when this court examines its rules").

75.     To prevail on a claim under FRCP 60(b)(3), "the moving party must prove by clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct and the conduct complained of prevented the losing party from fully and fairly presenting the defense." De Saracho v. Custom Food Mach., Inc., 206 F.3d 874, 880 (9th Cir. 2000).

76.     Under Twombly and Iqbal, the presumption that the allegations be analyzed in the light most favorable to the pleader does not apply to legal conclusions pled as factual averments or the mere recitation of the elements of the cause of action.

77.     Paragraph 5 of the Complaint provides that the dispute concerning the working capital estimate was at the heart of the State Court Action.  It is supposition and speculation.  It is not accurate.  It is an opinion, not a fact.  It is refuted by my reading of Judge Adams' FF&CL.  Judge Adams made several findings and conclusions regarding Morabito's lack of credibility, his failure and lack of intention to comply in any fashion with the CMA, his intentional false representations with respect to the CMA, and his lack of truth regarding the working capital and the value of BHI.

78.     The allegations in Paragraphs 6, 7, and 8 of the Complaint appear to mirror the assertions in the Morabito Declaration.

79.     Paragraphs 17 through 29 of the Complaint are simply an attempt to relitigate what either was or should have been litigated before Judge Adams in the State Court Action.

80.     Nothing in the Complaint indicates that the Herbst Parties made any active representations to the IA or anybody else in that respect.

16

81.     Even if the Court finds that the Claims are plausible, the Court must then consider whether the Claims are colorable.

82.     A claim is colorable if it could survive a motion to dismiss under FRCP 12(b)(6). See Walnut Creek Mining Co. v. Cascade Inv., LLC (In re Optim Energy, LLC), 527 B.R. 169, 173 (D. Del. 2015).

83.     The issue of a colorable claim is important.  The requirement that the claim be a colorable claim subsumes the requirement that the claim be beneficial to the estate based upon a cost-benefit analysis.

84.     Part of the colorable analysis requires the Court to determine whether there is a remedy with respect to the Claims that could plausibly benefit the estate.

85.     Here, the Claims are not colorable and could not plausibly benefit the estate.

86.     The Court finds it implausible that Morabito could not have discovered the "newly discovered evidence" through reasonable diligence.

87.     There were also several bases for Judge Adams' decision, including: (i) Morabito's failure to even attempt comply with the CMA and his misrepresentations in the CMA; (ii) the cumulative testimony of all the other parties about how Morabito attempted to control the documents and financial analysis that was being done by Paula Meyer; and (iii) the testimony of Ms. Meyer, Stan Bernstein, and Karen Scarborough regarding Morabito's misrepresentations on a number of subjects.

88.     Moreover, the working capital dispute was not the heart of Judge Adams' decision. Judge Adams broke down his damages, which were supported by Mr. Greene's Expert Report: (i) $20 million for Morabito's failure to comply with the terms of the CMA and misrepresentations in the CMA; and (ii) $66 million for Morabito's exaggeration of the earnings value of BHI, which total $86 million.  The Confessed Judgment was for $85 million.  That would indicate to the Court that the working capital dispute was not at the heart of Judge Adams' decision.

89.     As such, it is plausible that a court would find that the assertions of fraud in the Complaint have nothing to do with the nearly $20 million awarded as damages for Morabito's fraud with respect to the CMA.

17

90.     There is also little doubt that prosecuting the Complaint would be expensive and time-consuming.  Morabito has told the Court that he does not have financial resources such that he cannot fund prosecution of the Complaint.  Edward Bayuk may be able to loan Morabito the money, but the Court has no evidence of that.

91.     It would also take years for the estate to be administered, before the proceeds are distributed in accordance with the Bankruptcy Code.

92.     As such, it is not plausible that prosecuting the Complaint would bring any benefit to the estate.

93.     Debtors presented the Court with little admissible evidence in support of the Motion.

94.     Debtors filed the Morabito Declaration in support of the Motion.  However, the Morabito Declaration must be based upon Morabito's personal knowledge and be admissible.

95.     The Morabito Declaration is mostly hearsay and is full of legal argument.

96.     What Morabito states in the Morabito Declaration is what somebody else told him, who is not a party.  It is an out-of-court statement being offered for the truth of the matter asserted, which is hearsay, and there was no other evidentiary foundation submitted to the Court.

97.     Morabito's lack of credibility runs through the Chapter 7 Case as it did in the State Court Action and it relates to the Court's consideration of the mostly-deficient Morabito Declaration.  The Morabito Declaration is not credible.

98.     Therefore, there is not a sufficient evidentiary basis for the Court to be persuaded that there is a plausible and colorable claim for relief in the Complaint.

99.     Since the burden is upon Debtors as the moving party to show their entitlement to the benefit of the exception to the rule, the Court finds that Debtors have not met their evidentiary burden.

100.     The Claims asserted in the Complaint are also not colorable because the Debtors did not have standing to file the Complaint because only the Trustee had standing and the Trustee did not consent to allow the Debtors to file the Complaint and the Debtors did not request that the

Court order the Trustee to allow them to prosecute the Claims or to abandon the Claims pleaded in the Complaint.

101.    Based upon the foregoing, Debtors' request that Debtors be granted derivative standing to prosecute the Complaint is denied.

**B.    Debtors' Request for Abandonment.**

102.    The Court has been concerned about the Debtors' request for abandonment. Initially, Debtors asserted that they wanted to bring the Claims for the benefit of the estates but if abandoned the Claims will be prosecuted for the Debtors' benefit.  That inconsistency is why the Court requested additional briefing.  Secondly, the Debtors assert that in order to preserve the bankruptcy estates' rights to prosecute affirmative claims against the Herbst Parties, the Debtors' filed the December 16, 2016 Complaint.  Debtors admit that they filed the Complaint "because an Order for Relief in this case was entered on December 17, 2014, so the estate's extended statute of limitations set forth in section 108(a) of the Bankruptcy Code was set to expire on December 17, 2016, at the earliest."  ECF No. 131 at 2:22-25.  In determining how to resolve this conundrum, the Court has concluded there is no asset to be abandoned because the 2016 State Court action was not commenced by the Trustee or any other party in interest with standing to bring the Claims within the time allowed by Section 108.

103.    While Debtors generally requested that the Court order the Trustee to abandon the Claims as alternative relief in the Motion, the Motion did not refer to Section 554 or provide any analysis with respect to the statutory requirements for abandonment under Section 554.  See ECF No. 131.  In the Reply, Debtors cited to Section 554, but did not specify whether they were seeking abandonment under Section 554(b) or (c).  See ECF No. 140.

104.    The Court finds that Debtors did not satisfy their burden under any provision of Section 554.  See 5 COLLIER ON BANKRUPTCY ¶ 554.02[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (when an objection is made, the burden of proof is upon the movant seeking abandonment) (citing In re Pilz Compact Disc., 229 B.R. 630 (Bankr. E.D. Pa. 1999)).

105.    Section 554 provides that:

(a) After notice and a hearing, the trustee *may* abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

(b) On request of a party in interest and after notice and a hearing, the court *may* order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

(c) Unless the court orders otherwise, *any property scheduled under section 521(a)(1) of this title not otherwise administered at the time of the closing of a case* is abandoned to the debtor and administered for purposes of section 350 of this title.

(d) Unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate.

11 U.S.C. § 554 (emphasis added).

106.    "The word 'may,' when used in a statute, usually implies some degree of discretion."  United States v. Rodgers, 461 U.S. 677, 706-08, 103 S. Ct. 2132, 2150, 76 L. Ed. 2d 236 (1983) ("In addition, reading 'may' as either conferring or confirming a degree of equitable discretion conforms to the even more important principle of statutory construction that Congress should not lightly be assumed to have enacted a statutory scheme foreclosing a court of equity from the exercise of its traditional discretion.").

107.    Here, the Debtors, not the Trustee, requested that the Court order the Claims abandoned.  Thus, Section 554(a) is inapplicable.

108.    A bankruptcy court has discretion under Section 554(b) in determining whether to grant an abandonment request.  See In re Piatt, No. BAP.NV-07-1310-JUKPA, 2008 WL 8444827, at *4 (9th Cir. B.A.P. May 29, 2008) (not for publication) ("In some instances, the bankruptcy court's discretion is substituted for that of the trustee when a motion to abandon property is brought by a party in interest under § 554(b)."); In re Interpictures Inc., 217 F.3d 74, 76 (2d Cir. 2000) ("Section 554(b) gives the district court discretion to order abandonment of a debtor's worthless or burdensome property ….") (relying upon Johnston v. Webster (In re Johnston), 49 F.3d 538, 540 (9th Cir. 1995) ("Once a bankruptcy court has determined that the factual predicates for

20

abandonment ... are present, the court's decision to authorize or deny abandonment is reviewed for abuse of discretion.")).

109.    "An order compelling abandonment is the exception, not the rule."  In re K.C. Mach. & Tool Co., 816 F.2d 238, 246 (6th Cir. 1987).  See also In re Viet Vu, 245 B.R. 644, 647 (B.A.P. 9th Cir. 2000).

110.    Here, the Debtors failed to disclose the Claims to the Trustee, and the Court held that the Claims were implausible, not colorable, and could not survive a Rule 12 motion.  Thus, there is no possibility of a benefit to the estate from abandonment.  The evidence does not present a situation where the Court should apply the exception to the rule.

111.    A bankruptcy trustee has the exclusive right to sue on behalf of the estate.  Estate of Spiritos v. One San Bernardino County Superior Court Case Numbered SPR 02211, 443 F.3d 1172, 1175-77 (9th Cir. 2006).  Unless a party in interest is authorized to pursue a claim belonging to the bankruptcy estate, or the claim is abandoned, the trustee remains the only party with standing.  Id.  Standing is a jurisdictional requirement.  Tyler House Apartments, Ltd. v. U.S., 38 Fed.Cl. 1, 7 (Fed. Cl. 1997) (citing National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 255 (1994)).  And post-filing events cannot create jurisdiction.  Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 571 n. 4 (1992)).  Therefore, a lack of standing "cannot be cured nunc pro tunc back to the date when the original complaint was filed."  Id.  Nor can the defect be resolved by application of the relation back policy of Rule 17:

> Rule 17(a) does not apply to a situation where a party with no cause of action files a lawsuit to toll the statute of limitations and later obtains a cause of action through assignment. Rule 17(a) is the codification of the salutary principle that an action should not be forfeited because of an honest mistake; it is not a provision to be distorted by parties to circumvent the limitations period.

Id. (citing U.S. v. CMA, Inc., 890 F.2d 1070, 1074-75 (9th Cir. 1989)).  "On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(b).  Until a cause of action belonging to the bankruptcy estate is abandoned to the debtor, it may only be brought by the Trustee.  See Estate of Spiritos, 443 F.3d

at 1175-77.  An action brought by a party without standing cannot be cured after the limitations period has expired by either abandonment or the relation back rule.  See Tyler House Apartments, 38 Fed.Cl at 7-8.

112.    Finally, the estates' retention of the implausible and colorless Claims is not burdensome and confers a value and benefit upon the estates by aiding the efficient and timely administration of the cases.  The Court and the Trustee have already determined that the Claims are without merit and subject to dismissal.  As such, the Trustee should be permitted to retain the Claims for timely dismissal to prevent a further delay in the Trustee's administration of the cases. See Interpictures, 217 F.3d at 76 ("Finally, appellant's conduct in these proceedings has led to understandable concern that he might use this claim more as a means of harassment than of obtaining justified relief.").

113.    Abandonment under Section 554(c) requires that the property be scheduled and the case be closed.  See 11 U.S.C. § 554(c) ("[u]less the court orders otherwise, *any property scheduled under 521(1) of this title ... not otherwise administered at the time of the closing of a case* is abandoned to the debtor.") (emphasis added); In re Kreisel, 399 B.R. 679, 687–88 (Bankr. C.D. Cal. 2008) (property subject to abandonment must be scheduled); Moreno v. Autozone, Inc., No. C05-04432MJJ, 2007 WL 1063433, at *3 (N.D. Cal. Apr. 9, 2007) (holding that a debtor lacked standing to bring claims against her former employer because such claims were never scheduled and therefore could not be abandoned)).

114.    Here, the Claims were not scheduled.  Even when Morabito amended his schedules in December 2016, he did not disclose the dispute.  Morabito did not disclose any of the conversations he had with Mr. Dwelle or anybody else.

115.    The Chapter 7 Cases are also pending cases that are actively being administered by the Trustee.

116.    Based upon the foregoing, Debtors have not met their burden under any provision of Section 554 and the request for abandonment is denied.

**IT IS SO ORDERED.**

4827-5204-3849, v. 2